RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RESURRECTION SCHOOL; CHRISTOPHER MIANECKI, individually and as next friend on behalf of his minor children C.M., Z.M., and N.M.; STEPHANIE SMITH, individually and as next friend on behalf of her minor child F.S.,

*Plaintiffs-Appellants*,

*v.*

ELIZABETH HERTEL, in her official capacity as the Director of the Michigan Department of Health and Human Services; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan; LINDA VAIL, in her official capacity as the Health Officer of Ingham County; CAROL A. SIEMON, in her official capacity as the Ingham County Prosecuting Attorney,

*Defendants-Appellees*.

No. 20-2256

On Petition for Rehearing En Banc.
United States District Court for the Western District of Michigan at Grand Rapids;
No. 1:20-cv-01016—Paul Lewis Maloney, District Judge.

Argued En Banc: March 9, 2022

Decided and Filed: May 25, 2022

Before: SUTTON, Chief Judge; SILER, MOORE, COLE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, Circuit Judges.[*]

_____

[*]Pursuant to 6 Cir. I.O.P. 35(c), Composition of the En Banc Court, Judge Siler, a senior judge of the court who sat on the original panel in this case, participated in this decision.

_____

**COUNSEL**

**ARGUED EN BANC:** Erin Elizabeth Mersino, GREAT LAKES JUSTICE CENTER, Lansing, Michigan, Robert J. Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants.  Daniel J. Ping, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellees.  John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Amicus Curiae.  **ON SUPPLEMENTAL BRIEF:**  Erin Elizabeth Mersino, GREAT LAKES JUSTICE CENTER, Lansing, Michigan, Robert J. Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants.  Daniel J. Ping, Ann M. Sherman, Jennifer Rosa, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellees.  Bonnie G. Toskey, Sarah K. Osburn, COHL, STOKER & TOSKEY, P.C., Lansing, Michigan, for Appellees Linda Vail and Carol Siemon.  **ON AMICUS BRIEF:**  John J. Bursch, Cody S. Barnett, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Matthew F. Kuhn, Brett R. Nolan, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amici Curiae.

KETHLEDGE, J., delivered the opinion of the court in which SUTTON, C.J., and MOORE, COLE, CLAY, GIBBONS, WHITE, STRANCH, DONALD, THAPAR, LARSEN, NALBANDIAN, and MURPHY, JJ., joined, and READLER, J., joined in Parts I and II.A. MOORE, J. (pg. 8), delivered a separate concurring opinion in which WHITE, STRANCH, and DONALD, JJ., joined.  READLER, J. (pp. 9–11), delivered a separate opinion concurring in part and dissenting in part.  BUSH, J. (pp. 12–43), delivered a separate dissenting opinion in which SILER and GRIFFIN, JJ., joined.

_____

**OPINION**

_____

KETHLEDGE, Circuit Judge.  In this case, a private religious school and two parents of students who attend private religious schools seek a preliminary injunction as to a statewide mask mandate that the State itself repealed almost a year ago.  We hold that both this interlocutory appeal and the claim itself are now moot.

I.

In April 2020, Michigan Governor Gretchen Whitmer imposed a statewide mask mandate in response to the COVID-19 pandemic.  In September 2020, she extended the mandate to require children in elementary schools to wear masks in the classroom.  R.1-4.  On October 2, 2020, the Michigan Supreme Court held that both of the Governor's orders violated the Michigan

Constitution, on the ground that they represented the "exercise of the legislative power by the executive branch." *In re Certified Questions*, 958 N.W.2d 1, 24, 31 n.25 (Mich. 2020).

Yet a week later the Michigan Department of Health and Human Services imposed a mandate of its own, which likewise required masks in public settings, including classrooms in public and private schools. R.1-1. The order included a dozen exceptions, namely for "individuals who:"

(a) Except as otherwise provided . . . are younger than 5 years old . . . ;

(b) Cannot medically tolerate a face covering;

(c) Are eating or drinking while seated at a food service establishment;

(d) Are exercising outdoors and able to consistently maintain six feet of distance from others;

(e) Are swimming;

(f) Are receiving a service for which temporary removal of the face covering is necessary;

(g) Are entering a business or are receiving a service and are asked to temporarily remove a face covering for identification purposes;

(h) Are communicating with someone who is deaf, deafblind, or hard of hearing and whose ability to see the mouth is essential to communication;

(i) Are actively engaged in a public safety role, including but not limited to law enforcement, firefighters, or emergency medical personnel, and where wearing a face covering would seriously interfere in the performance of their public safety responsibilities;

(j) Are at a polling place for purposes of voting in an election;

(k) Are engaging in a religious service;

(l) Are giving a speech for broadcast or to an audience, provided that the audience is at least six feet away from the speaker.

That same month, the plaintiffs brought this suit, claiming that the State's mask mandate violated their right to the free exercise of religion under the First (and Fourteenth) Amendment to the U.S. Constitution. R.1 at 22–23. The plaintiffs also filed a motion to enjoin the mask mandate preliminarily, which the district court denied in December 2020. The plaintiffs then brought this appeal, asking us to enjoin the mandate while their case is litigated in the district court.

Meanwhile, between November 2020 and May 2021, the Department issued no fewer than twelve different orders revising its mask mandate—sometimes eliminating an exception (such as the one for polling places), other times tightening an exception (such as by limiting the exception for "service[s] for which removal of the face mask is necessary" to only medical services), and sometimes revising an earlier revision (such as a change to allow people to remove masks for "personal care services" like tanning and piercing).  By the spring of 2021, however, the relevant public-health conditions had changed. By then the U.S. Food and Drug Administration had authorized three COVID-19 vaccines; better therapeutics had become available; and case counts, hospitalizations, and deaths had fallen in Michigan.  The Department cited these developments— along with the "warmer weather"—and rescinded the mask mandate (and various other pandemic-related orders) on June 17, 2021.  Doc. 34-2.  The defendants then moved to dismiss this appeal as moot.

## II.

Any number of precepts about the federal judicial power (indeed, one could argue, nearly all of them) trace back to Chief Justice John Marshall's pronouncement that the "province of the court is, *solely*, to decide on the rights of individuals[.]"  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) (emphasis added).  The precept that follows here is that, under Article III, the "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (internal quotation marks omitted).  "Thus, when a case at first presents a question concretely affecting the rights of the parties, but—as a result of events during the pendency of the litigation—the court's decision would lack any practical effect, the case is moot."  *Ohio v. EPA* ("*Ohio*"), 969 F.3d 306, 308 (6th Cir. 2020).

## A.

In deciding whether a decision in this appeal would have any "practical effect," we must be mindful of "the distinction between mootness as to a preliminary-injunction appeal and mootness as to the case as a whole."  *Ohio*, 969 F.3d at 309.  "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the

district court enters a final judgment." *Id*. Whether a preliminary-injunction appeal is moot, therefore, depends on whether our decision would have any "practical effect" during that window of time.

The plaintiffs face strong headwinds on that point, given that the State has already rescinded the mandate that they ask us "preliminarily" to enjoin. Yet the plaintiffs argue that two exceptions to the mootness doctrine apply here.

*Voluntary Cessation*. The first exception is that a defendant's "voluntary cessation" of challenged conduct moots a case only if there clearly is "no reasonable expectation that the alleged violation will recur." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (cleaned up). Here, for the challenged conduct to recur, the State need not reimpose the "selfsame" mandate that it rescinded in June 2021. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (emphasis omitted). But the State would need to impose a mandate "similar" enough to the old mandate to present substantially the same legal controversy as the one presented by the plaintiffs' complaint. *See id*. at 662 n.3.

For several reasons, however, we see no reasonable possibility of that happening here. First, the State rescinded the mask mandate not in response to this lawsuit, but eight months later, along with several other pandemic-related orders. In doing so the State cited high vaccination rates, low case counts, new treatment options, and warmer weather. This case is therefore unlike *Speech First*, where the "timing" of the University of Michigan's cessation of the challenged conduct "raise[d] suspicions that its cessation [was] not genuine." 939 F.3d at 769. And the defendants' own political accountability diminishes any chance that they would reimpose the same mandate after this litigation ends.

Second, the relevant circumstances have changed dramatically since the Department imposed its statewide mask mandate in October 2020. At that time, nobody was vaccinated and treatments were less effective than they are now. The relevant circumstances now, in contrast, are largely the same circumstances that prompted the State to rescind the mandate.

Third, any future masking order likely would not present substantially the same legal controversy as the one originally presented here. Michigan imposed the first version of the

mandate at issue here before the U.S. Supreme Court had blocked any COVID-19 orders on free-exercise grounds. The Supreme Court and other courts have since blocked any number of them, thereby providing concrete examples of mandates and restrictions that violate the Free Exercise Clause. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67–68 (2020). The Court has also recently told us that "government regulations" are subject to strict scrutiny under the Clause "whenever they treat *any* comparable secular activity more favorably than religious exercise"; and that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. The plaintiffs' claim here is thus based primarily on the particular exceptions in the State's now-rescinded mandate—the idea being that, if those secular actors deserve relief, then the parents and children in this lawsuit do as well. *See, e.g.*, *id.* at 1297; *Roman Cath. Diocese*, 141 S. Ct. at 67–68. This dispute is therefore moot unless there is a decent chance that the defendant officials will not only impose a new mask mandate, but also roughly stick to the exceptions in the old one. And that prospect is exceedingly remote given all that has happened in the year or so since the State rescinded its mandate.

The plaintiffs emphasize that other government entities, like Ingham County, have imposed mask mandates more recently. But Ingham County has since rescinded its mandate too. And the question here is whether Michigan will reimpose the mask mandate on the School, not whether some other entity will do so. *See Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309–10, 310 n.1 (6th Cir. 2004).

During oral argument for this appeal, an amicus supporting plaintiffs offered another argument as to why this claim remains live—namely, that Resurrection School's principal admitted to violating the mask mandate and thus potentially could be subject to prosecution in the future. But arguments in support of justiciability can be forfeited. *See California v. Texas*, 141 S. Ct. 2104, 2116 (2021); *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021). And this argument was forfeited because it was raised for the first time at oral argument. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009). The argument is also meritless: the school's principal is not a party here, and thus is not among the

"individuals" whose rights we must adjudicate.  *Marbury*, 5 U.S. at 170.  Nor is there any credible threat of future prosecution.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014). If the principal or anyone else is ever prosecuted for violating the State's mandate, he can obtain a ruling on the mandate's constitutionality then.

*Capable of Repetition Yet Evading Review*.  This exception is inapposite for largely the same reasons the previous exception is.  Here, the challenged mandate was a product of the pandemic's early stages, and the plaintiffs' objections to it are grounded in the mandate's particulars.  We are unlikely to see this mandate in a similar form again.  *See Thompson v. DeWine*, 7 F.4th 521, 525–26 (6th Cir. 2021).  The plaintiffs' preliminary-injunction appeal is moot.

## B.

Whether the claim as a whole is moot depends on whether there is "a fair prospect that the [challenged] conduct will recur in the foreseeable future."  *Ohio*, 969 F.3d at 310.  For all the reasons recited above—the changed circumstances since the State first imposed its mask mandate, the substantially developed caselaw, the lack of gamesmanship on the State's part—we see no reasonable possibility that the State will impose a new mask mandate with roughly the same exceptions as the one originally at issue here.  This claim is moot—indeed palpably so.

\*     \*     \*

We dismiss this appeal and remand with instructions for the district court to dismiss this claim.  We also vacate the district court's order denying the plaintiffs' motion for a preliminary injunction, given that they lost their chance to appeal its merits through no fault of their own.  *See United States v. Munsingwear*, 340 U.S. 36, 39 (1950).

———————————

**CONCURRENCE**

———————————

KAREN NELSON MOORE, Circuit Judge, concurring. Three facts convince me that this claim is moot. First, in the months since the State lifted the mask mandate, the Centers for Disease Control has approved a vaccine for school-age children. *FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age*, Food & Drug Admin. (Oct. 29, 2021), https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age. Second, the State declined to reimpose a mask mandate during the spikes in COVID-19 cases caused by the Delta and Omicron variants. *See Tracking Coronavirus in Michigan: Latest Map and Case Count*, N.Y. Times (last updated May 25, 2022), https://www.nytimes.com/interactive/2021/us/michigan-covid-cases.html. Third, and relatedly, the State has now gone close to a year without reimposing a similar mask mandate. Therefore, I concur in the majority opinion.

———————————————————

**CONCURRING IN PART AND DISSENTING IN PART**

———————————————————

CHAD A. READLER, Circuit Judge, concurring in part and dissenting in part. I concur in parts I and II.A of Judge Kethledge's majority opinion, which hold that plaintiffs' preliminary injunction appeal is moot. But, for many of the reasons stated in Judge Bush's thoughtful dissent, I believe plaintiffs' claims for declaratory relief and a permanent injunction remain alive. To my mind, mootness of this appeal is distinguishable from mootness of the underlying claims.

Plaintiffs asked the en banc court to reverse the district court's decision denying a preliminary injunction. A preliminary injunction's fundamental purpose is to protect the status quo during litigation. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (per curiam). As a result, we lack jurisdiction over this appeal if there is no reasonable expectation that the state will reenact the mandate (or something similar) before the district court enters final judgment. *See Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 309 (6th Cir. 2020).

By all accounts, there is little chance that the state will do so. The school year is in its waning days, with summer break on the horizon. The calendar alone, in other words, dramatically reduces the need for a school mask mandate. That is true even for students and staff involved with summer instruction, as COVID-19 typically recedes during the summer, thereby lessening the need for mask requirements. *See Michigan Data*, Mich. Dep't of Health & Hum. Servs., https://www.michigan.gov/coronavirus/stats (last visited May 24, 2022) (displaying daily cases). In fact, the state rescinded its mandate last June partly because "the warmer weather ha[s] greatly reduced the spread of COVID-19." Doc. 34-2. Absent any realistic prospect of a masking-related burden on plaintiffs' religious liberties before the school bell rings this fall, a preliminary injunction "would lack any practical effect" during that period. *Ohio*, 969 F.3d at 308. Add in the fact that the district court likely can resolve expeditiously the "primarily if not entirely legal" issues that remain, and it becomes evident that plaintiffs' preliminary injunction appeal is moot. *Id.* at 309. On this latter point, I note that the district court has already performed much of the necessary analysis in holding that the county's school mask mandate likely violated the Free Exercise Clause. *Resurrection Sch. v. Hertel*, No. 1:20-cv-1016, slip op. at 15–17 (W.D. Mich.

Mar. 3, 2022); *see also supra*, at 5–6 (explaining that *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), set the legal framework for plaintiffs' Free Exercise challenge to the state's mask mandate).

"For the case as a whole, however, the mootness inquiry takes a longer view." *Ohio*, 969 F.3d at 310. That means the district court has jurisdiction over plaintiffs' claims for declaratory relief and a permanent injunction unless the state shows that there is no "fair prospect" that it will reenact the mandate "in the foreseeable future." *Id.*; *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Yet the state failed to make that showing. To the contrary, as Judge Bush explains, a real possibility remains that the state will restore the mandate. Take last year as an example. Plaintiffs enjoyed a respite from mask mandates for much of the summer of 2021 until Ingham County—acting "in compliance with guidance" from the state—imposed its own school mask mandate that September. R.80, PageID#1645. The majority and dissenting opinions disagree about whether the county's school mask mandate informs the issues before the en banc court. But at the very least, those events offer some insight into how state officials might confront public health issues as the upcoming summer turns to fall. *See Ohio*, 969 F.3d at 309 (noting that application of mootness principles "is driven above all by practicalities"); *see also Hawse v. Page*, 7 F.4th 685, 699 (8th Cir. 2021) (Stras, J., dissenting) ("Whatever else we might be able to say about the pandemic, absolute clarity is not one of its features."). Indeed, we have it on good authority that the state seemingly has not heeded the many lessons from the recent decisions in *Tandon* and *Monclova Christian Academy v. Toledo-Lucas County Health Department*, 984 F.3d 477 (6th Cir. 2020) (order). After all, when asked at oral argument whether the state would commit not to reenact its earlier mandate, the state's counsel bluntly responded: "Absolutely not." Oral Argument at 41:18–25; *cf. Hawse*, 7 F.4th at 699 (Stras, J., dissenting) ("[T]he court's novel theory that the County would not dare 'flout the Supreme Court's intervening pronouncements on equal treatment between religious exercise and comparable secular activity' . . . would be more comforting if it were based on anything the County had actually done or said." (citation omitted)).

All things considered, I believe the preliminary injunction proceedings are moot. But I would allow the district court to resolve plaintiffs' claims for declaratory relief and a permanent injunction, which seemingly involve a straightforward application of the rule that a regulation treating religious exercise worse than any comparable secular activity must survive strict scrutiny. *See Tandon*, 141 S. Ct. at 1296; *Monclova*, 984 F.3d at 480–82.

———————————

**DISSENT**

———————————

JOHN K. BUSH, Circuit Judge, dissenting. "Article III judges should not be in the business of declaring an end to the COVID-19 pandemic[.]" *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 572 (6th Cir. 2021) (Moore, J., dissenting). Rather, we should be willing to acknowledge "the thing about a once-in-a-century crisis"—that "it is hard to know how it will develop over the coming months and years, particularly when COVID-19 has defied expectations to this point[,] with new variants and seasonal surges threatening to undo hard-won progress." *Id.* at 573 (cleaned up). In this case, however, it appears that these principles will not carry the day. A court majority instead deems moot not merely plaintiffs' preliminary-injunction request, but their entire *case*. Thus extinguished is plaintiffs' opportunity to litigate their claims on the merits under a proper interpretation of the First Amendment. That unfortunate result rests, in my view, on a score of mistaken factual and legal premises. Our collective experience with two years of on-again-off-again masking mandates demonstrates that there is at least a reasonable possibility this dispute could recur. For that matter, the recent masking reimpositions in Ingham County *itself* show that this dispute could reasonably recur. *See* Izzy Martin, "Waverly Community Schools masking up starting Monday," *WLNS6.com* (May 18, 2022), https://perma.cc/Z4MR-5JST; Izzy Martin, "East Lansing Public Schools reinstates mask mandate," *WLNS6.com* (May 13, 2022), https://perma.cc/7SAW-WBY7; Sarah Lehr, "East Lansing schools reinstate mask mandate beginning Monday," *WKAR.org* (May 13, 2022), https://perma.cc/5SDN-V5WT. I therefore respectfully dissent.

**I.**

The majority's short opinion says little about the background of this case and, by virtue of having deemed it entirely moot, nothing about its merits. My approach will differ. A grasp of the underlying factual and procedural history is crucial to understanding the justiciability issues the majority places at center stage. So before turning to mootness, I will detail the origins of plaintiffs'

First Amendment claims, how they should have been properly adjudicated by our circuit, and why that never came to pass.

Resurrection School is a "small, private, Catholic school in Lansing," a city itself in Ingham County, Michigan. Amended Complaint ¶16, R. 21. The School strives "to integrate the Catholic faith into all portions of the school day." *Id.* ¶1. And it remained committed to doing so even despite COVID-19. In response to the pandemic, the School implemented extensive "safety protocols" to protect its students. Supplemental Appellant's Br. at 6–7. Those included social distancing, "enforced handwashing," "strict sanitization and disinfection of its facilities several times a day," limitations on who could visit the school, and even a requirement that students "wear masks in common areas." *Id.* But when it came to masking *during* classroom instruction, the School drew the line: no students would be forced to wear masks "when seated in the classroom." Amended Complaint ¶3, R. 21. As it explained, masks present "difficulties . . . for the spiritual, emotional, and physical development of younger students." *Id.* In particular, they impeded the School's religious instruction and violated a sincere religious obligation against covering faces "made in God's image and likeness." *Id.* ¶25.

Those scruples notwithstanding, the Michigan Department of Health and Human Services ("MDHHS") promulgated orders in October 2020 that directly conflicted with the School's religious views. Each required that children "participating in gatherings" such as classroom instruction be masked. And they contained no religious exemption. Rendered unlawful, then, was Resurrection School's continued practice of unmasked, face-to-face religious instruction.

The School responded soon after with a federal lawsuit challenging those orders. Its operative complaint named as defendants Robert Gordon,[1] then the Director of MDHHS; Dana Nessel, the Attorney General of Michigan; Linda S. Vail, the Health Officer of the Ingham County Health Department; and Carol A. Siemon, the Ingham County Prosecuting Attorney. The School sought declaratory and injunctive relief against both MDHHS's and Ingham County's enforcement of the restrictions, which the School alleged violated its and its co-plaintiffs' First Amendment

---

[1]Upon Gordon's departure from MDHHS, he was replaced by current MDHHS Director Elizabeth Hertel. She thus entered the suit via the automatic-substitution rule. *See* Fed. R. App. P. 43(c)(2).

rights. Yet despite its knowledge of this religious objection, MDHHS continued to promulgate masking orders that contained no exemption for face-to-face religious instruction.

The basic structure of the order that became the crux of this case was as follows. First, section 7—titled "Face mask requirement at gatherings"—explained in subsection (a) that "All persons participating in gatherings are required to wear a face mask." But section 8—titled "Exceptions to face mask requirements"—then enumerated a host of activities exempted from masking. In the order's own words:

> Although a face mask is strongly encouraged even for individuals not required to wear one (except for children under the age of 2), the requirement to wear a face mask in gatherings as required by this order does not apply to individuals who:
>
> (a) Are younger than 5 years old, outside of a child care organization or camp setting (which are subject to requirements set out in section 7(e));
>
> (b) Cannot medically tolerate a face mask;
>
> (c) Are eating or drinking while seated at a food service establishment or at a private residence;
>
> (d) Are exercising outdoors and able to consistently maintain six feet of distance from others;
>
> (e) Are swimming;
>
> (f) Are receiving a medical or personal care service for which removal of the face mask is necessary;
>
> (g) Are asked to temporarily remove a face mask for identification purposes;
>
> (h) Are communicating with someone who is deaf, deafblind, or hard of hearing and whose ability to see the mouth is essential to communication;
>
> (i) Are actively engaged in a public safety role, including but not limited to law enforcement, firefighters, or emergency medical personnel, and where wearing a face mask would seriously interfere in the performance of their public safety responsibilities;
>
> (j) Are engaging in a religious service;[2]

---

[2]Of note, MDHHS did not consider Resurrection School's face-to-face religious instruction to qualify for the "religious service" exemption. To the contrary, it apparently construed "service" to include only more formalized worship settings, such as a sermon. Thus, as counsel for the State seemed to confirm at oral argument, the order would permit Resurrection School's students to attend Mass on campus unmasked, and yet would bar the very same students from attending face-to-face religious instruction in the classroom unmasked. *See* Recording of Oral Arg. at 1:03:40–1:07:13.

(k) Are giving a speech for broadcast or to an audience, provided that the audience is at least 12 feet away from the speaker; or

(l) Are participating in a testing program specified in MDHHS's document entitled Guidance for Athletics . . . and are engaged in practice or competition where the wearing of a mask would be unsafe.

*See* "March 5, 2021 Gatherings and Face Mask Order," *Michigan.gov* (Mar. 5, 2021), https://perma.cc/MK89-DGZU.

This order then detailed several additional provisions exempting various other secular activities from the masking requirement. For instance, a separate portion concerning subsection (f)—the "personal care services" exemption—defined that term to include such "non-essential personal care services" as "hair, nail, tanning, massage, traditional spa, tattoo, body art, piercing services, and similar personal services." *See id.* Likewise, both collegiate and professional athletes were permitted to compete unmasked. *See* Becket Amicus Br. at 10 n.12; *see also* "Interim Guidance for Athletics," *Michigan.gov* (Apr. 1, 2021), https://perma.cc/U42B-3E3F (explaining that athletes with negative COVID tests were permitted to compete unmasked).

Read together, the orders and guidance thus established both a facially neutral and generally applicable masking requirement on the one hand, and, on the other, a host of secular exemptions to that requirement that undermined its purported general applicability. Indeed, everyone here agrees that the broad language of section 7 swept in Resurrection School's classroom instruction. But everyone also agrees that the companion provision, section 8, exempted from that language dining at a restaurant; dining with friends at a private gathering; receiving a haircut, tattoo, or massage; sessions in a tanning booth; or the installation of a nose-ring. Predictably, in response to that obvious disparity, Resurrection School moved the district court to enter a preliminary injunction as the parties litigated the case.

The district court denied that request, however, in mid-December 2020. It reasoned that the relevant analytical framework arose from this circuit's published decision in *Commonwealth v. Beshear*, rendered just a few weeks earlier. *See Resurrection Sch. v. Gordon*, 507 F. Supp. 3d 897, 900 (W.D. Mich. 2020) (citing *Commonwealth v. Beshear*, 981 F.3d 505, 508–09 (6th Cir. 2020)). Citing *Beshear* and a handful of other cases, the district court explained that a restriction on religious exercise triggers strict scrutiny when it is (1) motivated by animus, (2) regulates

religious activity as such, or (3) is neutral and generally applicable on its face but simultaneously so full of exemptions for comparable secular activities that it lacks neutrality and general applicability in practice. *Id.* at 901. *Beshear* itself had applied that tripartite test to a COVID-related closure the Kentucky government had imposed upon a religious school. *Beshear*, 981 F.3d at 507–09. Discerning neither animus nor targeting, *Beshear* focused its inquiry on general applicability. *Id.* at 509. But it reasoned that the contested order in that case *was* generally applicable, given that it "applie[d] to all public and private elementary and secondary schools in the Commonwealth, religious or otherwise[.]" *Id.* Because the order treated the religious school's identical secular comparator equally, *Beshear* reasoned, its incidental effect on religious exercise "need not be justified by a compelling governmental interest." *Id.* And so *Beshear* determined that the contested orders likely presented no First Amendment violation. *Id.* at 509–10.

In the district court's view, *Beshear* similarly disposed of Resurrection School's challenge to MDHHS's analogous masking order. *See Resurrection Sch.*, 507 F. Supp. 3d at 901–02. True, it noted, the order permitted those engaging in copious other secular activities to do so unmasked. *Id.* at 902. But the order also treated Resurrection School and its identical secular comparator—public schools—the very same. *Id.* ("[T]he exceptions apply to public schools and private schools equally, and they apply to secular schools and religious schools equally."). Thus, the district court reasoned, plaintiffs' showing of merely an "incidental" burden undercut their "likelihood of success on the merits," and so it denied relief. *Id.* Plaintiffs appealed that decision soon after.

Yet as their case was pending before a panel of this circuit, three precedential developments unfolded that were favorable for the School's position. First was our circuit's decision in *Monclova*. 984 F.3d 477 (6th Cir. 2020). Like *Beshear*, and like this case, *Monclova* concerned a COVID restriction imposed upon religious schools, and against which they raised a First Amendment objection. *Id.* at 479. Specifically, the Toledo-Lucas County Health Department had ordered the shutdown of every school in its jurisdiction—public, private, and parochial—"to slow the spread of COVID-19." *Id.* So just as in *Beshear*, the restriction applied both to religious exercise and to its identical secular analogues. *Id.* But at the same time, *Monclova* noted, the County had *not* imposed its shutdown order upon a host of secular activities—"gyms, tanning salons, office buildings, and a large casino"—all of which posed at least *comparable* risks to public

health. *Id.* at 479, 482. In other words, *Monclova* rejected *Beshear*'s assumption that general applicability should be assessed solely by considering whether the restriction burdens *identical* secular conduct. *See id.* at 481 ("We find no support for that proposition in the relevant Supreme Court caselaw."). To the contrary, *Monclova* reasoned that other "similar" and "comparable secular facilities" were relevant to the general-applicability analysis. *Id.* at 480. And, discerning no compelling rationale for the County's preferential treatment of those comparable secular activities, *Monclova* held the religious schools likely to succeed in showing a First Amendment violation. *Id.* at 482.

So why was all that consistent with *Beshear*—an earlier, published decision? Future panels are bound only by prior panels' *holdings*—the reasoning found in the earlier decision that both "contribute[d] to the judgment" and on which it is "clear" the earlier court "consciously reached a conclusion." *Wright v. Spaulding*, 939 F.3d 695, 701–02 (6th Cir. 2019). Yet as *Monclova* itself explained, *Beshear* "said nothing about the question" at issue in *Monclova*: "namely, whether an order closing public and parochial schools violates the [Free Exercise] Clause if it leaves *other* comparable secular actors less restricted than the closed parochial schools." *Monclova*, 984 F.3d at 481. Unconstrained by *Beshear* on that issue, therefore, *Monclova* analyzed whether the relevant order was generally applicable when judged against not only the burdens placed upon the religious school's *identical* secular analogues, but also upon other, at least *similar* secular comparators. *Id.* at 481–82. *Monclova* then reasoned that because Lucas County had shuttered a religious school while exempting "gyms, tanning salons, office buildings, and the Hollywood Casino," its order was subject to, and likely failed, strict scrutiny. *Id.* at 482.

A few months after *Monclova* came the second development: the Supreme Court, in *Tandon v. Newsom*, endorsed the same analytical framework as detailed in *Monclova*. 141 S. Ct. 1294 (2021); *see id.* at 1296. *Tandon* concerned yet another COVID restriction; this time, California's bar on multiple-family at-home religious gatherings. *Id.* at 1297. Despite that restriction, California simultaneously exempted "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants." *Id.* at 1297. If *Beshear* were the law, of course, none of those facts would have mattered to the Supreme Court. Instead, much like the Ninth Circuit below, it would have examined merely how California treated

the proscribed conduct's *identical* secular analogues—multiple-family at-home gatherings (for instance, a book club) to discuss secular works. *See Tandon v. Newsom*, 992 F.3d 916, 920 (9th Cir. 2021). *Beshear* would have dictated that those secular activities were the only relevant comparators, as only those activities would have presented identical risks to at-home religious gatherings. Yet that is precisely *not* how the Supreme Court reasoned. It instead deemed the exempted secular activities like hair salons and restaurants "comparable" to the religious gatherings, given that each imposed risks at least "similar." *Tandon*, 141 S. Ct. at 1296–97. And thus it held that California's failure to regulate such secular activities as harshly as it had in-home religious gatherings rendered its regime likely unconstitutional. *Id.* at 1297.

Following *Tandon* was the third development: the Supreme Court's decision in *Fulton v. City of Philadelphia*, which augmented the general-applicability principles detailed in *Tandon*. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). In *Fulton*, the Court confronted the City of Philadelphia's refusal to contract with Catholic Social Services ("CSS"), a foster-care services provider, because of CSS's sincerely held religious belief that same-sex couples should not be certified as prospective foster families. *Id.* at 1875. The City ended its fifty-year relationship with CSS because of its strong interest, or so it asserted, in opposing anti-homosexual discrimination. *Id.* Yet the City's "standard foster care contract" that it had signed with CSS specified that the City Commissioner, in his "sole discretion," could grant certain organizations of his choosing an exemption from that general policy. *Id.* at 1878. CSS's sincere religious objection to same-sex foster couples was apparently deemed an unworthy rationale for the dispensing of such relief. *Id.* So CSS sued, and the Supreme Court took up its case.

In its unanimous ruling for CSS, the Court reaffirmed *Tandon*'s conclusion that a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 1877. It thus seemed that CSS had a powerful argument that the Commissioner's ability to exempt organizations from the anti-discrimination rule refuted the regime's general applicability. After all, the contract apparently allowed the Commissioner to dispense exemptions for secular rationales that would have undermined the City's anti-discrimination interest in precisely the same way as would have an exemption for CSS. *Id.* at 1881–82. But the Court went even further in criticizing

Philadelphia's regime. As it explained, the contract's provision conferring executive discretion to grant secular exemptions removed the law entirely from the framework established by *Employment Division v. Smith*, 494 U.S. 872 (1990), under which facially general laws are presumptively valid. *Fulton*, 141 S. Ct. at 1878. To the contrary, the executive-discretion provision made the contract more like an individualized exemption scheme, which the Court held long ago in *Sherbert v. Verner* was presumptively *in*valid and subject to strict scrutiny. *Id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 403 (1963); *Smith*, 494 U.S. at 884 ("[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."). And because the City could "offer[ ] no compelling reason why it ha[d] a particular interest in denying an exception to CSS while making them available to others," the Court deemed the City's refusal to contract with CSS unable to satisfy that standard. *Fulton*, 141 S. Ct. at 1882.

## II.

Heading into their argument for this case, therefore, Resurrection School's lawyers must surely have felt armed with a formidable new degree of precedential firepower. *Monclova* had deemed likely invalid a governmental restriction on religious schools that failed to regulate comparable (but non-identical) secular conduct. 984 F.3d at 482. *Tandon* had then ratified that rule by explaining how California's regulations on at-home religious gatherings were likely invalid for their failure to equally burden "comparable" conduct in hair salons, personal-care-service venues, and restaurants. 141 S. Ct. at 1297. *Fulton* then buried the "only-identical-secular-conduct-counts" theory of general applicability, while simultaneously explaining that a regime conferring executive discretion to codify new secular exemptions from a purportedly general law (much as with MDHHS's continuous revisions of its orders to exempt new categories of secular conduct), merited strict scrutiny. *See, e.g.*, *Fulton*, 141 S. Ct. at 1879 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude[.]").

Surprisingly, however, the panel majority in this case attempted to weave around each of those precedents to affirm the district court's denial of preliminary relief.**³**  The panel majority recognized, of course, that under the rule of decision established in *Monclova*, it would have had to consider the order's exemptions for comparable (but non-identical) secular conduct when assessing whether the restriction upon Resurrection School was generally applicable.  *See Resurrection Sch. v. Hertel*, 11 F.4th 437, 456–57 (6th Cir. 2021), *vacated* 16 F.4th 1215 (6th Cir. 2021).  But the panel majority declined to apply *Monclova* on the ground that it conflicted with an earlier, published decision of the Sixth Circuit—*Commonwealth v. Beshear*. *Id.* at 457 (citing *Beshear*, 981 F.3d at 505).  In response to *Monclova*'s point that *Beshear* never actually rejected the relevance of non-identical secular comparators, the panel majority claimed that, to the contrary, "[i]n *Beshear*, we *did* consider whether the appropriate comparator was other non-religious schools or other non-school entities and held that the former was the appropriate comparator."  *Id.* (emphasis added).

How did the panel majority attempt to sustain such a claim?  By pointing to some of the *briefs* from *Beshear* that had suggested a broader comparator analysis.  *Id.*  Thus, the panel majority reasoned, because the "issue was brought to the attention of the court," *Beshear* had apparently implicitly rejected *Monclova*'s comparator analysis. *Id.* (cleaned up).  And under the law-of-the-circuit doctrine, in the panel majority's words, when "[f]orced to choose between conflicting precedents, we must follow the first one." *Id.* (quoting *United States v. Jarvis*, 999 F.3d 442, 445–46 (6th Cir. 2021)).  So the panel majority understood *Beshear*—not *Monclova*—to represent the law of the Sixth Circuit.  *Id.*

What about *Fulton*?  That precedent would seem to contain a powerful indictment of MDHHS's ever-shifting exemption scheme, as "it 'invite[d]' the government to decide which

---

**³**I realize that as a technical jurisdictional matter under 28 U.S.C. § 1292(a)(1), we as the en banc court are reviewing the preliminary-injunction decision of the district court rather than the panel majority's subsequent affirmation of that decision.  I include a discussion of the panel majority's analysis for two reasons.  First, exposition of the panel majority's errors is required for an exposition of the proper First Amendment standard that should have governed Resurrection School's claims—a standard on which today's majority opinion has necessarily shed no light given its conclusion that the entire case is nonjusticiable.  Second, the panel majority's reasoning here—particularly its view that MDHHS's order was lawful even under *Tandon*—guts the present majority's argument in favor of mootness that *Tandon* rendered a future MDHHS-style order so unthinkable that it could never recur.

reasons for not complying with the policy [we]re worthy of solicitude." *Fulton*, 141 S. Ct. at 1879. For instance, after initially instituting its masking order in October 2020, MDHHS later decided that it should codify new secular exemptions for "'personal care services, like tanning and piercing[s]." Majority Op. at 4. Yet as MDHHS exercised its discretion to dispense favorable treatment for such secular activities, its various revisions to the policy steadfastly refused to codify an analogous religious exemption for entities like Resurrection School. And it withheld such equal treatment even after gaining actual knowledge of the School's sincere religious objections to the masking policy, first explained in the School's federal complaint against MDHHS filed in October 2020.

For the panel majority, however, *Fulton* appears to have been thought virtually irrelevant. Its opinion included no substantive analysis of *Fulton*'s holding, instead simply reciting *Fulton*'s basic facts while making no attempt to apply that case's executive-discretion principle to Michigan's masking regime. *See Resurrection Sch.*, 11 F.4th at 458–59. The Supreme Court's decision was ultimately dismissed as containing merely a "narrow holding focused on a contract provision." *Id.* at 459.

And what about *Tandon*? As an on-point Supreme Court decision, it obviously would seem to supply the relevant analytical framework, no matter a putative conflict between *Monclova* and *Beshear*. Not so, however, at least according to the panel majority. As it expressly claimed, "*Tandon v. Newsom* does not compel a different comparator." *Id.* at 457 (citing *Tandon*, 141 S. Ct. at 1294). That was supposedly because the Supreme Court had deemed California's regime likely invalid for treating "*comparable* secular activities more favorably than at-home religious exercise[.]" *Id.* Yet the panel majority reasoned that no other exempted secular activities under the MDHHS order were even *comparable* to face-to-face religious instruction. *Id.* The risks posed by schools were instead "unique," since only schools brought children together "in an indoor setting and every day." *Id.* at 457–58. As a result, the only proper comparator to Resurrection School remained its identical secular analogues—"public and private non-religious schools." *Id.* at 458.

Of course, that analysis is patently inconsistent with the Supreme Court's reasoning in *Tandon*, which would have dictated that non-identical secular comparators be considered as well.

*Tandon*, 141 S. Ct. at 1296–97. Rather, the panel majority's approach tracked almost perfectly with the district court and Ninth Circuit's reasoning in *Tandon* that the Supreme Court itself *rejected*. Indeed, in denying relief—and foreshadowing the exact language the panel majority here would later employ—the district court there reasoned that the "unique" risks of at-home religious gatherings made secular at-home gatherings the only valid comparator. *See Tandon v. Newsom*, 517 F. Supp. 3d 922, 976 (N.D. Cal. 2021). And the restrictions were generally applicable, said the *Tandon* district court, since California treated each form of gathering equally. *Id.* A divided panel of the Ninth Circuit then doubled down on that conclusion. It too reasoned that the only valid comparator to religious at-home gatherings was secular at-home gatherings, given that only secular at-home gatherings posed identical risks. *Tandon*, 992 F.3d at 920. For instance, vis-à-vis California's less-regulated "train stations, malls, salons, and airports," at-home gatherings were more likely to involve "prolonged conversations" in "less ventilated" settings. *Id.* at 923, 925. And because California regulated equally both religious and secular at-home gatherings, the Ninth Circuit concluded as well that the religious restriction merited mere rational-basis review. *Id.* at 920. Yet the Supreme Court unequivocally *rejected* such reasoning in its own opinion on the dispute. *See Tandon*, 141 S. Ct. at 1296–97. *Tandon*, therefore, should have indicated to the panel majority that its refusal to consider a broader class of comparators was misguided.

And perhaps it did. Lacking conviction in its parsimonious reading of *Tandon*, apparently, the panel majority claimed that even if it *were* required to embrace a "broader conception of comparable secular activity, the MDHHS orders [we]re not so riddled with secular exceptions as to fail to be neutral and generally applicable." *Resurrection Sch.*, 11 F.4th at 458. So the underlying premise from which the panel majority reasoned is that there can exist some arbitrarily large number of exemptions disparately favoring secular conduct but that pose no First Amendment concern, at least until the exemptions can be deemed to "riddle" the challenged law. *Id.* This supposition stands in obvious tension with *Tandon*, which explained that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. Thus, it is difficult to understand how the panel majority thought itself correctly applying *Tandon* here. Its purported "application" of *Tandon* simply concluded that none of the exempted secular activities was comparable to face-to-face

religious instruction—a rehashing of its earlier point that such instruction posed "unique" risks and thus could be compared only to its perfect secular analogue. *Resurrection Sch.*, 11 F.4th at 458.

In any event, none of the panel majority's second-order attempts to distinguish Resurrection School's face-to-face instruction from the various secular activities MDHHS exempted can withstand analytical scrutiny. Take first, for instance, the panel majority's rationalization of the exemptions for eating, drinking, swimming, and medical treatments—said to be "inherently incompatible with wearing a mask." *Id.* at 458 (cleaned up). The apparent implication of this comment is that those activities are physically impossible while wearing a mask and thus are "inherently incompatible," while simultaneous masking and religious instruction is *physically* possible, and thus "compatible." *Id.*

Yet the problems with this argument are legion. Resurrection School has consistently asserted that simultaneous masking and proper religious instruction *is* physically impossible, given that seeing students' faces is critical to the school's religious instruction. *See, e.g.*, Amended Complaint ¶¶26–35, 130–32, R. 21; Appellant's Br. at 13–14. Likewise, it has also asserted that simultaneous masking and religious instruction is *spiritually* impossible, since it violates its school-members' sincere religious beliefs. *Id.* The panel majority's conclusion that masking and religious instruction are "compatible" after all seems predicated on nothing more than a judicial reappraisal of what Resurrection School's religious scruples do and do not permit. *See Resurrection Sch.*, 11 F.4th at 458 (describing plaintiffs' sincere religious objection to masked instruction as rendering masking merely "undesirable" for them).[4] For good reason, however, the Supreme Court has long instructed that this inquisitorial behavior is inappropriate for a federal tribunal. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." (quoting *Thomas v. Rev. Bd. of Ind. Emp.*

---

[4]Note the logical implication of this argument for religious liberty more broadly. It was physically *possible* for the schoolchildren in *Barnette*, for instance, to salute the flag, even though doing so would have violated their sincere religious beliefs. *See W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

*Sec. Div.*, 540 U.S. 707, 714 (1981)); *see also United States v. Ballard*, 322 U.S. 78, 85–88 (1944) (holding that courts may not inquire into the truth or falsity of sincerely held religious beliefs).

Other alleged distinctions the panel majority marshaled to justify the favorable treatment of the exempted secular activities included that they either (a) involved interactions "short[er] in duration" than classroom instruction or (b) had "a stringent social distancing requirement." *Resurrection Sch.*, 11 F.4th at 458. Supposed distinction (b) is difficult to even understand. Resurrection School *itself* had a "stringent social distancing requirement"—including during classroom instruction—as the School repeatedly explained in its briefs. *See* Appellant's Br. at 15–16, 29, 33–34; Corrected Reply Br. at 1, 4. If anything, then, that both the School and certain of the exempted secular activities had a social-distancing requirement would make them *more* alike for comparator analysis, not less. Supposed distinction (a) is probably true for at least certain of the secular exemptions, like briefly lowering a mask when voting for identification purposes. But it hardly could be said to characterize *all* the secular activities the orders exempted. For instance, the orders would permit someone engaging in secular activities to spend *all day* unmasked while indoors: breakfast at a diner; then a haircut; then lunch; then a massage, piercing, or tattoo; then dinner. By contrast, a student attending Resurrection School necessarily could *not* have spent the full day unmasked. Masks were required while walking into the school and while walking in common areas, such as in hallways between classes. Supplemental Br. at 6. It was only during classroom instruction *itself* that masks were asserted to conflict with religious instruction. *See id.* at 6–7; Amended Complaint ¶¶26–35; 130–32. So the panel majority's claim that Resurrection School would pose "unique" dangers if granted an analogous exemption cannot be sustained on these alternative grounds either. *Resurrection Sch.*, 11 F.4th at 457.

The panel majority last asserted that certain other secular exemptions—for police, fire, and emergency medical services—were distinguishable (a) because they were necessary to fulfill "important obligations" to "citizens' health and safety" and (b) because "wearing a face mask would seriously interfere in the performance of their public safety responsibilities." *Id.* at 458. (emphasis deleted). Yet each of these purported distinctions rests, once again, not on any known precept of legal reasoning, but instead a value judgment that Resurrection School's religious views are neither an "important obligation[ ]" nor sincerely held. *Id.* Only by entertaining the first

supposition could the panel majority have concluded that unmasked, face-to-face religious instruction does not serve an "important obligation[ ]." *Id.* And only by entertaining the second— that the School's religious beliefs are insincere—could the panel majority have concluded that masking does not "seriously interfere" with the School's religious mission. *Id.* at 458. These implicit premises went unstated of course, for reasons about which I will not speculate, other than to note that they clearly conflict with established Supreme Court precedent concerning inquisition into the sincerity of religious views. *See Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531; *Thomas*, 450 U.S. at 714; *Ballard*, 322 U.S. at 88.

Thus was the world as we knew it in August 2021, after the panel decision emerged. The panel majority considered *Beshear* controlling, *Monclova* but a nullity under the law-of-the-circuit doctrine, *Tandon* to compel no "different comparator," and *Fulton*'s "narrow holding" seemingly irrelevant *per se*. *See Resurrection Sch.*, 11 F.4th at 457–59. With nowhere left to go but a petition for certiorari or rehearing en banc, Resurrection School availed itself of the latter path in the hope that it might vindicate its rights at last against MDHHS's illegal order.

**III.**

And, for good reason, we granted that request. *See Resurrection Sch. v. Hertel*, 16 F.4th 1215, 1216 (6th Cir. 2021). Given the clear conflict among *Beshear*, *Monclova*, and the panel decision in this case, rehearing en banc became "necessary to secure and maintain [the] uniformity of the court's decisions." *See* Fed. R. App. P. 35(b)(1)(A). And given the additional tension between the panel decision and *Tandon*, rehearing en banc was likewise necessary to restore our precedent's conformity "with a decision of the United States Supreme Court." *Id.* Unfortunately, however, today's majority has achieved neither task. By declaring plaintiffs' entire *case* nonjusticiable, the majority has necessarily said *nothing* about the proper rule of decision for First Amendment claims and *nothing* about whether *Beshear* or *Monclova* represents the law of our circuit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). That decision is wrong as a matter of both substance and procedure, and I shall now explain why.

A. *MDHHS's and Ingham County's Voluntary Cessation of the Restrictions Did Not Moot the Case, and their Orders are Capable of Repetition, Yet Evading Review*

The leading edge of the majority's argument that Resurrection School's challenge is now moot arises from the fact that MDHHS rescinded its masking order "almost a year ago" in June 2021. Majority Op. at 2.[5] True, Resurrection School is not subject to MDHHS's order *at present*. But as the Supreme Court has repeatedly explained—in the very context of COVID restrictions, no less—a defendant's voluntary cessation of challenged conduct cannot alone moot a case. *See Tandon*, 141 S. Ct. at 1294 ("[E]ven if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case."); *see also Already, LLC v. Nike*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (holding that because the defendant had "not carried the 'heavy burden' of making 'absolutely clear' that it could not revert to its [prior] policy," the controversy was not moot); *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (cleaned up)). Rather, such voluntary cessation moots the case only if the party claiming mootness—here, defendants—meets its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC*, 568 U.S. at 91 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 190).

Likewise, the cessation of challenged conduct also cannot moot a case when that conduct is "capable of repetition, yet evading review." *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 170 (2016) (quoting *Spencer v. Kenma*, 523 U.S. 1, 17 (1998)). This additional doctrine[6]

---

[5]Note how MDHHS's order was already withdrawn by the time the panel majority adjudicated its legality in August 2021. Ironically, the panel majority first had to conclude that the mandate was capable of repetition, yet evading review and that defendants' voluntary cessation did *not* moot the case in order to deny the religious-liberty claim. *See Resurrection Sch.*, 11 F.4th at 452 (holding that defendants' voluntary cessation did not moot the case because it is not "'absolutely clear' that [defendants] will not reimpose a mask requirement" and because "[p]laintiffs' claims further come within the exception to the mootness doctrine for actions that are 'capable of repetition, yet evading review.'").

[6]The voluntary cessation and capable of repetition, yet evading review doctrines are sometimes called "exceptions" to Article III mootness. *See, e.g.*, *Resurrection Sch.*, 11 F.4th at 449. I find this term misleading, as it implies that the doctrines would permit a federal court to spuriously enjoin some contested behavior that was certain

becomes relevant when two conditions apply: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Tech., Inc.*, 579 U.S. at 170 (cleaned up) (quoting *Spencer*, 523 U.S. at 17); *see also Weinstein v. Bradford*, 423 U.S. 147, 148 (1975). No one here much contests that MDHHS's order satisfies element 1— and for good reason. The Supreme Court has held that a period of even "two years is too short to complete judicial review of the lawfulness" of challenged conduct. *Kingdomware Tech., Inc.*, 579 U.S. at 170 (citing *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514–16 (1911)). So our only dispute concerns element 2—whether there exists a reasonable possibility that MDHHS could subject Resurrection School to a masking restriction once again. *Id.*

Indeed, as the majority itself notes, a reasonable possibility of recurrence is the critical inquiry around which *both* the relevant doctrines—voluntary cessation and capable of repetition, yet evading review—coalesce in this case. Majority Op. at 5–7. In the majority's view, however, neither doctrine absolves the preliminary-injunction request (or even the case itself) of mootness, as there is "no reasonable possibility" that MDHHS could again subject Resurrection School to the challenged restriction. *Id.* at 7. The majority's conclusion appears to rest upon four principal arguments: (1) defendants' good-faith rescission of the order and "political accountability" show that MDHHS would not reimpose a mandate; (2) Ingham County's orders—rescinded only in February—are irrelevant to the litigation against MDHHS; (3) the changed legal landscape after *Tandon* shows that no reasonable officer would reimpose an MDHHS-style order; and (4) the threat from COVID-19 has abated such that there is "no reasonable possibility" MDHHS (or Ingham County) could reimpose a mandate. *Id.* at 5–7. As explained below, however, none of these proffered rationales can withstand serious scrutiny.

---

never to recur. Federal courts, of course, do not have the power to render advisory opinions. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). But the two aforementioned doctrines, in my view, are consistent with that principle, because they "merely recognize a shift from a present harm to a potential future harm." Tyler B. Lindley, *The Constitutional Model of Mootness*, 48 BYU L. Rev. __ (draft at 1) (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4050643. In this sense, the "exceptions are not really exceptions at all," given that it is uncontroversial Article III courts may dispense remedies to mitigate potential future harms. *Id.*; *see, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908). So I do not consider myself to be advocating for the application of true "exceptions" to Article III in these pages; rather, I believe that whether "the harm recurs in the future" from a mask mandate "is likely enough" here "to satisfy the requirements of Article III." Lindley, *supra*, draft at 8.

1.  <u>Claim One: Good-Faith Rescission and "Political Accountability"</u>

The first reason given for why the case is extinguished is that MDHHS rescinded its order months rather than weeks after being sued, supporting an inference of good-faith rescission under *Speech First*, and that, as well, "defendants' own political accountability" would prevent them from reimposing a similar restriction. *Id.* at 5 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019)). I will address those points in turn.

As to good faith, the *Speech First* decision actually *undermines* the majority's reasoning rather than supporting it. That case concerned a First Amendment challenge levied against the University of Michigan Office of Student Conflict Resolution's ("OSCR") overbroad definitions of the terms "harassing" and "bullying." *Speech First, Inc.*, 939 F.3d at 762. About a month after the challengers filed suit, OSCR removed the objectionable definitions from its website, so the district court deemed the case moot. *Id.*; *see also Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700, 714 (E.D. Mich. 2018) (explaining the timeline of the definitions' removal). In reversing that determination, however, we evaluated not merely one factor (good faith), but four: good faith; the University's refusal to disavow reenactment of the challenged definitions; the rescission's status as a "discretionary[ ] and easily reversible action[ ]"; and the definitions' continued defense by the University. *Speech First, Inc.*, 939 F.3d at 768–70. So how does MDHHS's behavior fare under the framework that *Speech First* established? Not so well. The "good faith" contention as a rationale for a mootness finding makes little sense in this context, and the latter three factors from *Speech First* clearly cut *against* the majority's position.

*Good Faith*. A defendant's *bad*-faith rescission—rescission done as in *Speech First* itself to purposefully evade judicial review—is no doubt insufficient by itself to moot a case. The majority's *non sequitur* here is to argue the reverse—that because MDHHS's rescission was done in apparent *good* faith, MDHHS thus will never reimplement the restriction. In the context of this case, however, there is no necessary relationship between those two propositions. Indeed, MDHHS could have rescinded its orders in perfectly good faith and yet could still reinstitute them in perfectly good faith as well. Why? Because MDHHS did not rescind its orders on the ground that they might conflict with the First Amendment—a matter of legal principle not contingent on shifting real-world conditions. The agency instead cited improving *factual* circumstances

surrounding COVID-19. Because those circumstances could change—and, in fact, are changing—the agency could reinstitute its orders in light of updated circumstances, even if its earlier rescission had been in good faith under *previous* circumstances. Merely that MDHHS's rescission occurred in alleged good faith in response to one set of facts, in other words, tells us nothing about whether MDHHS could reinstitute its orders in light of some different set of facts. So what about the other three considerations mentioned above?

*A Refusal to Disavow Reenactment*. As we recognized in *Speech First*, a defendant's failure to "affirmatively state[ ] that it does not intend to reenact the challenged" provision counsels against a finding of mootness. *Id.* at 769. Thus, we held that the mere *absence* in the record of the University's disavowal of its prior, constitutionally suspect definitions created an inference that they could be reenacted. *Id.* Here, by contrast, we confront no uncertainty about whether MDHHS has disavowed reimposition of its masking order. To the contrary, MDHHS's counsel at oral argument explicitly *refused* to disavow its reimposition. The Court pressed counsel on this point directly, asking, "Are you willing to commit today that the state won't reenact its prior rule?" Recording of Oral Arg. at 41:18–41:25. Counsel's response was emphatic: "*Absolutely not*." *Id.* So Resurrection School's argument on this factor is even stronger than was Speech First's. There is no uncertainty about whether MDHHS has or might disavow reinstitution of its mask mandate; *cf. Speech First*, 939 F.3d at 769, it already categorically told us that it is keeping the option of another mandate on the table.

*A Discretionary and Easily Reversible Action*. Additionally, *Speech First* recognized a key distinction between rescission effected by the *legislature*'s passing of a new law versus merely an *executive* body's "discretionary[ ] and easily reversible" withdrawal of some contested restriction. *Id.* at 768. As we there explained, when "the government voluntarily ceases its actions by enacting new legislation or repealing the challenged legislation, that change will presumptively moot the case"—a concept that we referred to as the judicial "solicitude" afforded the legislature's decision. *Id.* By contrast, however, the "easily reversible" cessation of an executive-branch action does *not* presumptively moot a case. *Id.* Rather, "*significantly more* than [such] bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.* (emphasis added).

The import of this distinction for today's dispute?  Counsel for MDHHS conceded at oral argument that MDHHS could reinstitute its masking order "on a moment's notice," "without the legislature," "on their own," and "without any other approval."  Recording of Oral Arg. at 43:42–44:03.  Thus we owe no deference to MDHHS's bare rescission of its order. *See Speech First*, 939 F.3d at 768.  Its rescission was, instead, a quintessential "easily reversible" executive-branch action, for which a "significantly" higher showing is required before diagnosing the case as moot. *Id.*

*A Continued Defense*.  Last, both *Speech First* and the Supreme Court's own precedents instruct that a challenge to a rescinded policy is unlikely moot when the defendant mounts a vigorous defense of the policy's lawfulness.  *See id.* at 770 ("Significantly, the University continues to defend its use of the challenged definitions."); *see also Parents Involved in Comm. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("[T]he district vigorously defends the constitutionality of its race-based program, and nowhere suggests that if this litigation is resolved in its favor it will not resume using race to assign students.  Voluntary cessation does not moot a case or controversy unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, a heavy burden that [defendant] has clearly not met." (cleaned up)).  The reason for such holdings is obvious: if the defendant admits the error of his ways, it supports an inference that he has acquiesced in refusing to commit future violations.  Yet a vigorous defense creates exactly the opposite inference: the defendant's desired freedom to resume the challenged conduct shows that it is *not* "absolutely clear" the defendant will abstain from those future violations.

As applied to this case, if ever there were a "vigorous defense" of a contested policy, MDHHS and Ingham County have mounted it.  Both have steadfastly refused to admit that their policies of declining a religious exemption to Resurrection School violated the First Amendment.  To the contrary, they have insisted upon the constitutionality of their policies before the district court, before the original panel, and now before the en banc court.  Echoing the panel majority, MDHHS contends that its orders were neutral and generally applicable, that *Tandon* and *Fulton* cannot compel a different result, and that *even if* its orders were subject to strict scrutiny, they would satisfy that standard.  *See* MDHHS Supplemental Br. at 17 ("*Tandon*'s framework

underscores that there is no Free Exercise Clause violation here, and *Fulton* offers little guidance on comparability.").

Ingham County likewise believes the orders are neutral and generally applicable, even despite *Tandon* and *Fulton*, and could survive strict scrutiny as well. *See* Ingham County Supplemental Br. at 21. Ingham County's brief also asserts—as did counsel for MDHHS at oral argument, *see* Recording of Oral Arg. at 35:58–39:16—that *Monclova* is wrongly decided and null because it purportedly conflicts with our earlier decision in *Commonwealth v. Beshear*. *See* Ingham County Supplemental Br. at 16 ("The Panel's decision correctly provides that if forced to choose between conflicting precedent, [courts] are required to follow the first one, which in this case is *Beshear*."). Given these persistent defenses, neither entity has given us any reason to believe that they have acquiesced and seen the error of their ways. In their ideal world, we would hold that their orders were perfectly constitutional, and thus that they are free once again to criminalize Resurrection School's face-to-face instruction.

That all brings me to the majority's speculation about how defendants' "political accountability" would surely prevent reimposition of a mask mandate. *See* Majority Op. at 5. That is a curious argument. I had always thought that defendants' imposition and rescission of the mask mandate was based upon biological science rather than political science. I also would have thought that insulation from political accountability was the very *reason* the Michigan legislature, through an extensive delegation, established an independent public-health bureaucracy full of advisors removable "for good cause"—so that it could institute measures unpopular but deemed necessary to safeguard the public health without fear of democratic reprisal. *See* M.C.L. 333.2208(3); *see generally Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935). Perhaps MDHHS is immune from the ordinary principles of administrative law, but why that might be so the majority never says.

The majority moreover offers no empirical support for its "political accountability" claim. If anything, polling suggests that the Michigan public might actually *favor* reimposition of a mask mandate. *See, e.g.*, Ken Haddad, "Poll: Where Michigan voters stand on mask mandates, COVID vaccines requirements," *Click on Detroit* (Jan. 12, 2022), https://perma.cc/BU84-6UP8 (explaining that "63% of [Michigan] voters support a requirement for people to wear masks in

indoor places[.]"). In any event, how disquieting for Resurrection School that its religious free exercise should hinge upon the caprice of the electorate. *See Barnette*, 319 U.S. at 638 ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials[.]").

### 2. Claim Two: The Supposed Irrelevance of the Ingham County Orders to this Proceeding

As noted above, one of the foundational assumptions underlying the majority's mootness analysis is that MDHHS's order was "repealed almost a year ago." Majority Op. at 2. One would have to be forgiven, based on that comment, for believing that Resurrection School thus has not been subjected to a mask mandate since June 2021. But that would be false. Resurrection School was actually subject to the mandate until February 2022, shortly before this case was argued. This latter mandate was the creation of Ingham County, rather than a direct imposition from MDHHS itself. But just like its predecessor from MDHHS, this new mandate illegalized Resurrection School's face-to-face instruction as it simultaneously exempted "restaurants, hair and nail salons, performance venues, gyms, office buildings, indoor sports venues, [and] casinos." Opinion & Order at 16, R. 77. And, it turns out, Ingham County's decision to impose such a measure was deeply intertwined with MDHHS's own views on the necessity of masking.

The majority's contention to the contrary rests on its mere *ipse dixit* that the two mandates have nothing to do with each other, and thus that Ingham County's behavior is categorically irrelevant to its mootness analysis. Majority Op. at 6.[7] I disagree with the majority, of course, but so does Ingham County. When it initially imposed its mask mandate in September 2021, it explicitly cited MDHHS's August 13, 2021, guidance "stating that all schools should require universal indoor masking"—i.e., *sans* religious exemption—as a rationale for its own imposition of indoor masking. *See* "Emergency Order (Ingham 2021-2) for Control of Epidemic," *Ingham Cnty. Health Dep't* (Sept. 2, 2021), https://perma.cc/K25B-URTF. And what about when Ingham County rescinded its order this February? As it explained to the district court, "because MDHHS

---

[7]Inversely, because the majority insists that MDHHS and Ingham County have nothing to do with each other, today's opinion has said nothing about whether that portion of Resurrection School's suit against the latter is moot. Resurrection School is thus free to continue pursuing relief against Ingham County.

guidance regarding masks has changed, Ingham County has *shifted its policies accordingly*." Opinion & Order at 6, R. 77 (emphasis added); *see also* 2/17/2022 Transcript at 14:4-12, 21:16-25, R. 80 (explaining that Ingham County both imposed and rescinded its "universal masking" mandates in schools "[b]ased on" and "in compliance with guidance" from MDHHS).

As Resurrection School points out in its briefs before us, it is a basic principle of equity jurisprudence that a defendant bound by an injunction cannot escape the decree by enlisting a third party to do his bidding. Indeed, Federal Rule of Civil Procedure 65(d) provides that even a *nonparty* with notice of a decree can be held in contempt for working in "active concert or participation" with a party to violate the terms of the injunction. Fed. R. Civ. P. 65(d)(2)(C). As the Supreme Court has explained, this principle prevents "nullif[ication of] a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *see also McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339, 344 (9th Cir. 1966) ("Nonparties may be found in contempt of an injunction provided that they have actual notice of the injunction and aid or abet its violation.").

The majority's unexplained refusal to consider Ingham County's conceded cooperation with MDHHS to impose a mask mandate thus creates an illogical disparity. Rule 65 provides that even a *nonparty* acting in concert or participation with a defendant-party may be jailed for contempt of a decree. *McGraw-Edison Co.*, 362 F.2d at 344. Yet in the majority's view, when a *party to the suit* (Ingham County) acts in concert with another party to the suit (MDHHS) to carry out an illegal act, that fact is categorically insufficient to show that a suit against the latter is even justiciable. *See* Majority Op. at 6.

Contrary to what the majority implies, its creation of that mismatch finds no support in the cited pages or footnote from our decision in *Chirco v. Gateway Oaks*. *But see id.* (citing *Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309–10, 310 n.1 (6th Cir. 2004)). If anything, *Chirco* actually *supports* justiciability in this case. *Chirco* involved a businessman, Chirco, who sued a condominium developer, Gateway Oaks, for copyright infringement, claiming that condos Gateway Oaks had constructed were substantially similar to condos that Chirco himself had designed. *Chirco*, 384 F.3d at 308. He also filed a notice of *lis pendens* on the condos, the point of which was to inform potential buyers that an action was pending against the property. *Id.*

The district court canceled the *lis pendens*, however, reasoning that the copyright suit "did not affect the *title* to the Gateway Oaks condominiums." *Id.*  Chirco appealed the cancellation.  *Id.* Yet as the suit proceeded, Gateway Oaks sold off all the condos to third parties. *Id.* at 309. Chirco conceded, therefore, "that any decision by [the Sixth Circuit] would have [had] no impact on the instant case against Gateway Oaks."  *Id.*  But he asked us to adjudicate the validity of the cancellation anyway, as a *lis pendens* dispute could potentially recur between Chirco and some other party not before the court.  *Id.*  We refused to do so, however, applying the basic principle that the capable-of-repetition doctrine requires that the dispute be capable of repetition between the same parties.  *Id.* at 309–10 (citing *Norman v. Reed*, 502 U.S. 279, 288 (1992)).

That the majority views *Chirco* (or the same-party requirement more generally) as defeating the relevance of Ingham County's behavior to the mootness analysis here betrays a basic misunderstanding of Resurrection School's argument.  Resurrection School is not seeking an abstract declaration that MDHHS's mandate was illegal solely because it might later deploy that holding against some unknown party in some future, collateral proceeding—as Chirco might have done against some unknown third party not before the court. Instead, it wants a ruling that MDHHS *itself* must stop instructing Ingham County to impose "universal indoor masking" *sans* religious exemption upon the School.  *See* "Emergency Order (Ingham 2021-2) for Control of Epidemic," *supra*.  And given that Ingham County "shift[s] its policies accordingly" based on what MDHHS tells it to do, Opinion & Order at 6, R. 77, Resurrection School plainly has a justiciable interest in securing a decree against MDHHS itself.  What it fears, in other words, is not merely a repetition of Ingham County's behavior, but of MDHHS's as well, given MDHHS's evident control over Ingham County's decisions.**[8]**

---

**[8]**That Ingham County may once again "shift[ ] its policies accordingly" based on new masking guidance from MDHHS, Opinion & Order at 6, R. 77, is bolstered by MDHHS's explicit acknowledgment on its own website that it may institute new masking measures in response to "future phases" of the pandemic.  *See, e.g.*, "Updated Masking Guidance for Michiganders," *Mich. Dep't of Health & Hum. Servs.* (Feb. 16, 2022), https://perma.cc/4ALG-U53H ("Recommendations regarding masking may change as conditions evolve—such changes could include the presence of a new variant that increases the risk to the public, or an increased number of cases that strains the healthcare system.").

3. Claim Three: No Reasonable Officer Would Reinstitute an MDHHS-Style Order after *Tandon v. Newsom*

The majority next asserts that no reasonable officer would reimpose an MDHHS-style mandate given the now-"substantially developed caselaw" on general applicability; namely, the Supreme Court's decision in *Tandon*. Majority Op. at 7, *id.* at 5–6 (citing *Tandon*, 141 S. Ct. at 1294). Yet the majority's bare assertion gives me no confidence that MDHHS and Ingham County share that understanding of the relevant precedent. MDHHS *itself* kept its contested orders in place for *months* after *Tandon* came down. Ingham County likewise promulgated its own orders disparately burdening Resurrection School's religious free exercise well after *Tandon*. For that matter, the only reason we are even in an en banc proceeding right now is because the panel majority held that MDHHS's orders were lawful even under *Tandon*. *See Resurrection Sch.*, 11 F.4th at 457 ("*Tandon v. Newsom* does not compel a different comparator." (citation omitted)). And both MDHHS and Ingham County continue to insist that their orders pose no First Amendment concern, even under *Tandon*. *See supra* pages 30–31; *see also* 2/17/22 Transcript at 22:9-20, R. 80 (contending that Ingham County's orders are generally applicable even under *Tandon* and *Monclova* and that, in any event, they could satisfy strict scrutiny). It is simply not credible to claim that *Tandon* itself obviated the possibility that an MDHHS-style order could return.

4. Claim Four: COVID has Abated Such That There is "No Reasonable Possibility" Defendants Could Reimpose a Mask Mandate

The majority last asserts that conditions have so improved regarding COVID-19 that there is "no reasonable possibility" defendants could reinstitute a mask mandate. Majority Op. at 7. Much like the majority's speculation about defendants' "political accountability," however, this intuition about a rapidly evolving public-health situation—derived from a year-old record assembled in a preliminary-injunction proceeding—has scant empirical support. Indeed, in the weeks after our oral argument for this case, the following institutions have either reinstated or extended their mask mandates in light of new surges of COVID-19:

- **Columbia University**
    - *See* "As of April 11, Non-Cloth Masks are Mandatory in Classrooms," *COVID-19 Resource Guide for the Columbia Community* (Apr. 10, 2020), https://perma.cc/P9TK-ACJT.

- **Georgetown University**
    - *See* Lauren Lumpkin, "Georgetown, Johns Hopkins temporarily restore some covid measures," *Wash. Post* (Apr. 7, 2022), https://perma.cc/Z39F-27V6.

- **Johns Hopkins University**
    - *See id.*

- **The City of Philadelphia**
    - *See* Elizabeth Wolfe, "Philadelphia will reinstate its indoor mask mandate as cases rise," *CNN* (Apr. 11, 2022), https://perma.cc/76XM-QHKK?type=image.

- **American University**
    - "Mask Guidelines: New Spring 2022 Protocols," *American University* (last visited Apr. 12, 2022), https://perma.cc/WR33-RSL6?type=image ("As of April 12, 2022, masks will be required in all campus buildings, except when individuals are alone in private offices, inside residence hall rooms with only roommates, or when actively eating or drinking.").

- **George Washington University**
    - *See* "GW to Reinstate Indoor Mask Requirement," *The George Washington University* (Apr. 11, 2022), https://perma.cc/4SPU-HVEQ.

- **The University of Connecticut**
    - *See* "UConn Reinstituting mask requirement as COVID positivity rates rise," *News 8 wtnh.com* (Apr. 15, 2022), https://perma.cc/75S6-W5V9?type=image.

- **Rice University**
    - *See* Giulia Heyward, "Virus outbreaks are pushing some U.S. universities to reinstate mask mandates," *N. Y. Times* (Apr. 16, 2022), https://perma.cc/KF9N-9JRS.

- **Elementary schools in (1) Ottawa, (2) Chicago, (3) North Carolina, (4) New Jersey, (5) Milwaukee, (6) California, (7) Massachusetts, and (8) Pennsylvania**

    o *See* Caroline Alphonso, "Ottawa public school board reinstates mask mandate as other boards make new plea for masking," *The Globe & Mail* (Apr. 13, 2022), https://perma.cc/Y2QB-6EGT.

    o *See* Kelly Davis, "Some classes at North Side school return to mask mandate after increase in Covid cases," *WGN9* (Mar. 21, 2022), https://perma.cc/2R37-NSJE.

    o *See* Samantha Kummerer, "Masks are back at Carrboro High School after uptick in COVID cases connected to prom," *ABC11* (Apr. 14, 2022), https://perma.cc/QGL3-MU6K.

    o *See* Lauren McCarthy, "Two high schools in New Jersey reinstate mask mandates following outbreaks," *N. Y. Times* (Apr. 1, 2022), https://perma.cc/2T5A-L8NC.

    o *See* Elizabeth Wolfe & Andy Rose, "Milwaukee schools reinstate mask mandate just one day after it was dropped," *CNN* (Apr. 20, 2022), https://perma.cc/4JEP-7WDD.

    o *See* "Pacific Charter High School reinstates mask mandate amid spike in COVID cases after spring break," *ABC7* (Apr. 20, 2022), https://perma.cc/V3HP-NPB5?type=image.

    o *See* Adria Watson, "Northampton reinstates school mask mandate following increase in COVID-19 cases," *Boston Globe* (May 11, 2022), https://perma.cc/Q75C-H2M6.

    o *See* "Masks go back on at Woodland Hills High School," *Pittsburgh Post-Gazette* (May 5, 2022), https://perma.cc/NTF2-DABF.

    o *See* "Pittsburgh Public Schools to require masks again, starting Friday," *11 News* (May 12, 2022), https://perma.cc/84NX-ABCB.

    o *See* "Masks Now Required at Evanston Township High School as COVID Cases Rise," *NBC5 Chicago* (May 16, 2022), https://perma.cc/SMC2-E2NP.

- **The University of Rochester**

    o *See* "Face mask mandate reinstated on University of Rochester campuses," *WXXI News* (Apr. 15, 2022), https://perma.cc/R9N9-E5MS.

- **The State University of New York–Orange**
    - *See* "SUNY Orange Returns to Indoor Masking (effective April 18, 2022)," *SUNY Orange* (last visited Apr. 18, 2022), https://perma.cc/VNJ9-E3JK.

- **Syracuse University**
    - *See* Jeanne Lockman, "Syracuse University to require masks during classes, some events as COVID cases rise," *CNYCentral* (Apr. 18, 2022), https://perma.cc/S6X7-3C8C.

- **Bowdoin College**
    - *See* "Reinstating Masks (April 12, 2022)," *Bowdoin College Office of the President* (Apr. 12, 2022), https://perma.cc/3CN2-5ZW6?type=image.

- **Rockefeller University**
    - *See* "Updates on COVID-19," *The Rockefeller University* (Apr. 15, 2022), https://perma.cc/YD3M-K4T2.

- **Los Angeles County Public Transit**
    - *See* "Los Angeles County to Issue New COVID-19 Health Order Requiring Masks on All Public Transit," *NBC Los Angeles* (Apr. 21, 2022), https://perma.cc/VN7Y-Q477.

- **The Centers for Disease Control's ("CDC") Airline Mask Mandate**
    - *See* Heather Murphy, "Masks Stay On: C.D.C. Keeps the Mandate on Planes," *N. Y. Times* (Apr. 13, 2022), https://perma.cc/D5K7-BP36.
        - Of note, after a Florida district court enjoined enforcement of this particular mandate, the CDC authorized the Department of Justice to appeal the decision after certifying that a transportation masking mandate remains "necessary for the public health." *See* "CDC Statement on Masks in Public Transportation Settings," *CDC Newsroom* (Apr. 20, 2022), https://perma.cc/73LU-4P5K.

- **San Francisco Public Transit**
    - *See* Lauren McCarthy, "The largest transit system in the Bay Area reinstates a mask mandate for riders," *N. Y. Times* (Apr. 28, 2022), https://perma.cc/2HW2-ZD9F.

- **Various Schools in Ingham County itself**
    - *See* Izzy Martin, "East Lansing Public Schools reinstates mask mandate," *WLNS6.com* (May 13, 2022), https://perma.cc/7SAW-WBY7.
    - *See* Sarah Lehr, "East Lansing schools reinstate mask mandate beginning Monday," *WKAR.org* (May 13, 2022), https://perma.cc/5SDN-V5WT.
    - Izzy Martin, "Waverly Community Schools masking up starting Monday," *WLNS6.com* (May 18, 2022), https://perma.cc/Z4MR-5JST.

Given these developments—which include even reimposed mandates in Ingham County itself—I would hesitate to categorically declare that there is "no reasonable possibility" defendants could reinstate their prior orders.**[9]** I recognize, of course, that the materials just cited are not in the present record of this case, and so I do not fault the majority for failing to address those specific sources. What I *do* fault the majority for, however, is its decision to declare moot not merely Resurrection School's preliminary-injunction request—the order actually before us—but its entire *case* against MDHHS, thus forever precluding the School from introducing those materials (or whatever else it sees fit) into the record at the district court in a trial on the merits. The majority's reasoning stands in substantial tension with circuit and Supreme Court precedent, *see infra* at 40–43, and works an intolerable unfairness on Resurrection School.

What we should have done instead was vacate the district court's denial of the preliminary injunction, which was based on an erroneous understanding of the First Amendment. We then should have remanded both that order and the case itself to the district court for a fresh analysis of the preliminary-injunction factors—an analysis the district court has never properly conducted. *See* Order at 7, R. 24. Because there is a "reasonable possibility" that MDHHS or Ingham County (at the former's behest) could reinstitute the challenged orders either during the pendency of the

---

**[9]**In addition to the masking reimpositions that we are *already* seeing across the United States, there is also the reasonable possibility of reimpositions later on, such as this fall and winter. *See, e.g.*, Yasmeen Abutaleb & Joel Achenbach, "Coronavirus wave this fall could infect 100 million, administration warns," *Wash. Post* (May 6, 2022), https://perma.cc/H4SL-F8SB. For that reason as well, Resurrection School plainly has a justiciable interest in securing long-term relief through a permanent injunction or declaratory judgment.

litigation—which itself could take yet additional months—or after it, plaintiffs retain a live interest in seeking both preliminary and permanent relief.

But let's pretend that I'm wrong about all that. Pretend the present record on interlocutory appeal really *does* give rise to justiciability concerns. Would it thereby follow that the appropriate course was the majority's here—to deem the entire *case* moot and make no meaningful attempt to clarify the merits of the relevant free-exercise jurisprudence? Certainly not. As it turns out, there was an alternative path available to us, a path not taken, through which we could have decided this appeal that would have simultaneously respected the majority's apparent justiciability qualms while also doing much good to clarify the free-exercise law of our circuit. In the section that follows, therefore, I will briefly describe that approach—and why its apparent repudiation further underscores the indefensible nature of today's result.

### B. Unwinding the Majority's Conflation of the Preliminary-Injunction Proceeding and the Permanent-Injunction Proceeding

Today's decision will have the practical effect of a final judgment, given that it brings an end to Resurrection School's suit against MDHHS. Strictly speaking, however, we are not evaluating a final decision of the district court. This case comes to us instead on the denial of a preliminary injunction, and so is an interlocutory appeal under 28 U.S.C. § 1292. *See* 28 U.S.C. § 1292(a)(1). Thus, what we are doing (or, rather, should have been doing) is *predicting* whether Resurrection School would likely succeed on the merits of its claims at trial, where it then would have sought a permanent injunction and declaratory judgment. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394–96 (1981). The distinction between review of a preliminary injunction and a permanent injunction is critical here, in my view, for two reasons.

First, the litigation of a preliminary-injunction request in the district court involves a rapid, abbreviated proceeding in which the district court itself attempts to predict whether the plaintiff is likely to succeed at trial. *See Camenisch*, 451 U.S. at 395 (noting that a preliminary-injunction proceeding involves procedures "less formal" and evidence "less complete" than a trial on the

merits).**10**  The decision is fast paced because its purpose is simply to protect plaintiffs' rights during the litigation, up to and until the district court can rule on the merits of the permanent injunction and declaratory judgment.  *Id.* (noting the relative "haste" of such preliminary proceedings).  For this reason as well, the district court's determinations at the preliminary-injunction stage have no preclusive effect upon its determinations at the merits stage regarding the permanent injunction and declaratory judgment.  *Id.*; *see also Gjertsen v. Bd. of Election Comm'rs of City of Chicago*, 751 F.2d 199, 202 (7th Cir. 1984) ("A preliminary injunction has no preclusive effect—no formal effect at all—on the judge's decision whether to issue a permanent injunction."). So the irony here is that we are declaring plaintiffs' *merits* challenge moot, and thus their entire case against MDHHS extinguished, based on an abbreviated and outdated record assembled at a preliminary and non-preclusive proceeding held over a year ago.

Second, and more important, is that the majority's decision to declare the entire *case* against MDHHS moot—rather than simply deciding the preliminary-injunction appeal—has stripped us of a valuable opportunity to clarify the law of our circuit.  What the majority should have done, instead, is rule solely on the interlocutory order before us.  That would have put us in the predictive posture characteristic of preliminary injunctions that I mentioned above.  In the course of deciding whether to affirm the denial of preliminary relief, therefore, we could have ruled on whether Resurrection School was *likely* to illustrate justiciability at the merits proceeding and, even if we thought *that* showing deficient, whether it was likely to succeed on the merits of its First Amendment claim as well.  That is because, as we recently explained, Article III courts sitting in such a "predictive" posture may permissibly opine on both justiciability *and* the merits (technically, *likely* justiciability and *likely* merits), even if they believe the former likely lacking. *See Arizona v. Biden*, 31 F.4th 469, 479 (6th Cir. 2022) ("We address these [merits] questions despite our initial doubts about standing and reviewability given the predictive nature of the likelihood-of-success inquiry at this early stage.").**11**

---

**10**For instance, the district court denied the preliminary-injunction request here without even holding a hearing.

**11***Arizona* involved a request for a stay of a preliminary injunction rather than a request for a preliminary injunction itself, 31 F.4th at 472, but this difference is immaterial for present purposes, as the predictive posture of each, and the factors used to evaluate each, are the same.  *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 434 (2009)

Thus, we could have explained that Resurrection School was likely to succeed on the merits of its free-exercise claim, given that *Tandon* overruled *Beshear*. But then our court—presumably a different subset of it, as I would not have agreed on this point—also could have explained that Resurrection School was unlikely to establish justiciability. So we could have affirmed denial of *preliminary* relief on that basis, and yet "withh[e]ld judgment" on whether the entire *case* was moot, *see Ramsek v. Beshear*, 989 F.3d 494, 500 (6th Cir. 2021), given that the *case's* justiciability hinges on rapidly evolving factual circumstances that plaintiffs should have had a fair shot at introducing into the record. We then could have remanded the case so the district court could have taken updated information about COVID-19 and made a ruling on the justiciability of the permanent injunction and declaratory judgment in a trial on the merits.[12]

Such an opinion, even though delivered in a preliminary posture, would have provided valuable guidance to litigants in our circuit about the proper scope of the First Amendment—just as the Supreme Court's orders-docket opinions have done on the same topic. *See, e.g.*, *Tandon*, 141 S. Ct. at 1294. And that approach would have been much fairer to plaintiffs as well, giving them a procedural window to introduce new evidence about what continues to be a rapidly evolving situation. *See, e.g.*, *Ramsek*, 989 F.3d at 500 (dismissing an *appeal* as moot but "withhold[ing] judgment on whether the case as a whole is moot" and remanding for the district court to evaluate additional theories of injury); *see also Reclaim Idaho v. Little*, 826 F. App'x 592, 595 (9th Cir. 2020) (remanding a case in which the mootness issue arose in the first instance on appeal "to allow the parties to develop the record and brief the district court on whether th[e] controversy [was] 'capable of repetition, yet evading review.'").

Instead, today's majority has done the very opposite. It makes not a prediction about justiciability in the context of an interlocutory order, but instead an affirmative declaration that there is no case or controversy *at all* between Resurrection School and MDHHS. *See* Majority

(noting the substantial overlap of the stay and preliminary-injunction tests because "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined."); *see also Bristol Regional Women's Ctr., P.C. v. Slatery*, 988 F.3d 329, 344 n.1 (6th Cir. 2021) (Thapar, J., dissenting) ("[T]here is no material difference between a preliminary injunction case and a stay case: Courts apply the same test in both."), *vacated on other grounds* 994 F.3d 774 (6th Cir. 2021).

[12]And, because this case is not moot, the district court presumably would have ruled on the merits of Resurrection School's requests for declaratory and permanent-injunctive relief as well.

Op. at 7.  As a result, it has necessarily said nothing about the merits of the First Amendment challenge underlying today's dispute.  *Steel Co.*, 523 U.S. at 101–02.  So Resurrection School is now stripped of its right to make its case for permanent relief in the district court, while similar litigants throughout our circuit will be left uncertain about what standard governs the Free Exercise Clause.  Prudence, in my view, would have dictated a different course.

\* \* \*

I hope that I am eventually proven wrong.  I would be quite pleased if COVID-19 were to permanently enter humanity's rear-view mirror.  But the point is that I—just like the majority— have no basis upon which to proclaim that my hopes today will surely become realities tomorrow.  Because I would hold that the present controversy is not moot, I respectfully dissent.