NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0137n.06

Case No. 23-5170

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MCKEE FOODS CORPORATION, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| BFP, INC dba Thrifty Med Plus Pharmacy, | ) | |
| Defendant-Appellee, | ) | |
| | ) | O P I N I O N |
| STATE OF TENNESSEE, | ) | |
| Intervenor-Appellee. | ) | |
| | ) | |

FILED
Mar 21, 2024
KELLY L. STEPHENS, Clerk

Before: McKEAGUE, READLER and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. McKee Foods Corporation ("McKee") maintains that appellee BFP, Inc. d/b/a Thrifty Med Plus Pharmacy ("Thrifty Med") has engaged in a three-year campaign to get reinstated into McKee's Prescription Drug Program ("PDP") pharmacy network—a campaign that has included Thrifty Med filing multiple administrative complaints against McKee and actively lobbying to change Tennessee pharmacy laws in its favor. McKee filed this lawsuit, seeking a declaratory judgment and injunctive relief to prevent Thrifty Med from attempting to rejoin its PDP pharmacy network. Specifically, McKee seeks to clarify that Tennessee's "any willing pharmacy" ("any-willing-pharmacy") laws are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), and that state law does not require it to include Thrifty Med in its approved network of pharmacies. The district court

dismissed the suit for lack of subject matter jurisdiction, holding that McKee's claims were rendered moot following changes to the underlying state laws and other factual developments in the case. We conclude, however, that McKee's complaint is not moot. Therefore, we **VACATE** the district court's decision and **REMAND** for further proceedings.

**I.**

*Factual Background.* McKee Foods is a commercial bakery in Tennessee that offers a health benefits plan ("Health Plan"), governed by ERISA, for its eligible employees and their eligible dependents. Health Plan benefits are funded by contributions from McKee Foods and plan participants. One of the many advantages of membership in the Health Plan is access to its Prescription Drug Program ("PDP"). The PDP grants more favorable benefits when participants purchase prescription drugs from in-network pharmacies as compared to out-of-network pharmacies. As co-administrator of the PDP, McKee actively determines which pharmacies are part of the Program's approved network of pharmacies.

Thrifty Med, an independent pharmacy in Tennessee, was formerly a member of the PDP's in-network pharmacies. However, an audit of Thrifty Med's practices revealed that some of its operations were, in McKee's view, inconsistent with the Health Plan's terms. The audit results led McKee and its third-party pharmacy benefits manager ("PBM") to remove Thrifty Med from its PDP network in July 2019. Unhappy with its removal from the PDP network, Thrifty Med took several measures to try to gain its reinstatement. For instance, Thrifty Med's owners sought and obtained multiple meetings with McKee; circulated petitions amongst McKee employees for them to express support for Thrifty Med's reinstatement; commissioned multiple large billboards in service of their cause; and enlisted their attorney to send letters to McKee's counsel, invoking Tennessee's any-willing-pharmacy statute to support its call for reinstatement. Thrifty Med's

owners also sent several emails and texts directly to Tennessee representatives to lobby for the passage and ratification of PC 569.[1]

Eventually, Thrifty Med sensed a shift of Tennessee law in its favor. A brief overview of the sequence of changes in Tennessee pharmacy law over the relevant period will aid in our analysis. Following the May 2021 passage of Public Chapter 569 ("PC 569"), the Tennessee legislature enacted Tenn. Code Ann. § 56-7-3120(b) ("§ 3120(b)") and prescribed new rules for prescription drug programs. With an effective date of July 1, 2021, the text of PC 569 read as follows:

> (b) A pharmacy benefits manager or a covered entity shall not interfere with the patient's right to choose a contracted pharmacy or contracted provider of choice in a manner that violates § 56-7-2359 or by other means, including inducement, steering, or offering financial or other incentives.

Tenn. Code Ann. § 56-7-3120(b) (2021). In turn, Tenn. Code § 56-7-2359, first enacted in 1998, is informally known as the "any-willing-pharmacy" law and requires insurers to include all pharmacies as a provider if the pharmacy agrees to the terms and conditions of the plan. *Reeves-Sain Med., Inc. v. BlueCross BlueShield of Tenn.*, 40 S.W.3d 503, 505 (Tenn. Ct. App. 2000). PC 569 created a new remedy for the existing any-willing-pharmacy law that would subject any covered entity that did interfere with the rights provided under § 56-7-2359, to a range of penalties (e.g., license revocation, civil penalties, etc.) imposed at the discretion of the Commissioner of the Tennessee Department of Commerce and Insurance ("TDCI"). *See* Tenn. Code §§ 56-2-305(a), 56-7-3110.

Notably, PC 569 relied on the existing definition of "covered entity" within Tennessee law, which, among other groups, included "self-insured entities" like McKee. Tenn. Code Ann. § 56-

---

[1] Thrifty Med's owners also lobbied Tennessee legislators and Governor Bill Lee for the passage of the PC 569's successor bill, PC 1070.

7-3102(1) (2021). The term "covered entity" made no express reference to ERISA plans. But, on July 8, 2021, the TDCI issued a bulletin clarifying that "covered entities" "includes 'self-insured entities,' which would include ERISA plans" and that "[n]o exclusions in the PBM laws are carved out to exclude plans currently regulated by ERISA." (R. 36-4, PageID 299–300). The bulletin concluded that "[t]he Department will enforce Pub. Ch. 569 accordingly." (*Id*. at 300).

Based on PC 569's revisions to Tennessee law and the clarifying statements issued by the TDCI, Thrifty Med took the position that this new state law required McKee Foods to include Thrifty Med as an in-network pharmacy. Thrifty Med then picked up its pursuit of reinstatement to McKee's PDP network by submitting claims for payment for services it had rendered to Health Plan members. When McKee denied those claims, Thrifty Med filed three administrative complaints with the TDCI dated September 13, October 12, and October 18, 2021, respectively. The relief sought in each complaint was reinstatement to McKee's PDP network. However, the administrative complaints were short-lived; the TDCI dismissed them in letters dated October 27, November 2, and November 30, 2021, respectively.

*Procedural History.* Roughly two weeks before the TDCI disposed of the last administrative complaint, McKee commenced this litigation. Its three-count complaint seeks: (1) a declaratory judgment that Tenn. Code Ann. § 56-7-2359, as amended by PC 569, is preempted by ERISA; (2) an order enjoining Thrifty Med from pursuing any legal or administrative action to enforce the state's any-willing-pharmacy laws against McKee or otherwise to force McKee to include Thrifty Med in its PDP; and (3) instruction from the court as to the scope of its fiduciary duties in determining which pharmacies to include in the Health Plan and whether the Health Plan is subject to § 56-7-2359, as amended by PC 569. Thrifty Med filed its answer on December 22, 2021—over a month after its third and final administrative complaint had

been dismissed. In it, Thrifty Med admitted that an actual controversy existed between the parties, asserted that McKee removed Thrifty Med without cause from the PDP, and asserted that it was entitled to reinstatement because its exclusion contravened § 3120(b). On January 6, 2022, the parties held a telephonic Fed. R. Civ. P. 26(1) discovery conference, during which they discussed the "two dispositive legal questions" regarding Tenn. Code Ann. § 56-7-2359. (R. 16, PageID 79–80). The resulting Discovery Plan filed with the court provided that McKee would file its dispositive brief on or before March 31, 2022, and identified the two dispositive legal questions as follows:

> (1) To the extent [Tenn. Code Ann.] § 56-7-2359 and/or Public Chapter 569 purport to regulate Plaintiff's discretion to determine which pharmacies are in its prescription drug program network, is the state law preempted by ERISA?

> (2) Whether [Tenn. Code Ann.] § 56-7-2359 exempts self-funded ERISA plans like [McKee's] Health Plan from its provisions and, if so, whether Public Chapter No. 569 revises or revokes that exemption.

(*Id*.)

On April 27, 2022, four months after Thrifty Med filed its answer, the Tennessee Legislature passed Public Chapter 1070 ("PC 1070") (effective January 1, 2023). Among various changes to Tennessee's pharmacy laws, PC 1070 further revised § 3120(b) to now read:

> (b) A pharmacy benefits manager or a covered entity shall not:

> (1) Interfere with the right of a patient, participant, or beneficiary to choose a contracted pharmacy or contracted provider of choice in a manner that violates § 56-7-2359; or

> (2) Offer financial or other incentives to a patient, participant, or beneficiary to persuade the patient, participant, or beneficiary to utilize a pharmacy owned by or financially beneficial to the pharmacy benefits manager or covered entity.

Tenn. Code Ann. § 56-7-3120(b) (2022). PC 1070 also expanded the § 3102(1) definition for "covered entities" to include ERISA plans. *Id*. § 3102(1)(A)(xii) (2022). About a month later,

McKee moved for summary judgment. The next day, Thrifty Med filed a competing motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment.

In Thrifty Med's declaration and stipulation in support of its motion to dismiss, Thrifty Med's president, Greg Bohannon, briefly recounted the facts of the dispute, highlighted the passage of PC 569, and noted the lack of any ongoing administrative complaints. Bohannon stipulated that Thrifty Med would "no longer pursue reinstatement to McKee's Prescription Drug program under the current version (codifying Public Chapter 569) of Tennessee's 'Any Willing Pharmacy' scheme, including Tenn. Code Ann. §§ 56-7-3102 and 56-7-3120." (R. 38-2, PageID 349). At the same time, Bohannon declared that "it remain[ed] to be determined whether Thrifty Med w[ould] pursue reinstatement under" PC 1070. (*Id.*).

The district court held a hearing on the pending dispositive motions and subsequently entered its Memorandum Opinion and Order granting Thrifty Med's Motion to Dismiss. The court concluded that because (1) the TDCI dismissed Thrifty Med's administrative complaints, (2) Thrifty Med had taken no further legal action, and (3) Thrifty Med had stipulated that it had no current plans or intentions to pursue reinstatement under PC 1070, McKee's alleged "harm" was too speculative to demonstrate the existence of a live case or controversy over which the court could exercise jurisdiction, and thus the case was moot. McKee timely appealed.

## II.

We review determinations of standing and mootness de novo. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).

## III.

*Article III Case or Controversy Requirement.* Article III of the United States Constitution limits the jurisdiction of federal courts to adjudication of "cases" and "controversies." *Already,*

*LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). McKee brings suit in part under the Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, which mirrors the constitution's "cases" or "controversies" requirement. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937). A justiciable case or controversy exists when the parties have "'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' even though the injury-in-fact has not yet been completed." *See Nat'l Rifle Ass'n of Am*, 132 F.3d at 280 (quoting *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)). Importantly, the actual case and controversy requirement applies "not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC*, 568 U.S. at 90–91 (quotation marks and citation omitted).

Here, the parties do not dispute that an actual case and controversy existed at the outset of the litigation; they disagree as to whether later developments in the law and the facts rendered McKee's lawsuit moot. A case is moot, "and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Mokdad v. Sessions*, 876 F.3d 167, 169 (6th Cir. 2017) (quoting *Already, LLC*, 568 U.S. at 91) (quotations omitted). Thus, mootness sets in if the "result of events during the pendency of the litigation" causes the court's decision to "lack any practical effect." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc) (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)), *cert. denied*, 143 S. Ct. 372 (2022).

*Change in Legislation.* Sometimes, a change in the law can lead to a case becoming moot. *See, e.g.*, *Diaz v. Kinkela*, 253 F.3d 241, 243 (6th Cir.2001). Because of the potential terminal effect of such changes on then-pending cases, we first address the impact, if any, of changes to Tennessee's pharmacy laws on McKee's action against Thrifty Med. McKee contends that

Tennessee's passage of PC 1070 did not render its claims moot because the new law did not substantially and materially amend the pertinent statutory language of PC 569. We agree.

When the legislature changes a statute on which a party's claim is premised, the court must first determine if the case brought under this statute remains live. *See Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 692 (6th Cir. 2022). While a change in law "tends to 'eliminate the case-or-controversy,'" not every amendment will result in automatic mootness. *Id.* (quoting *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 822 (6th Cir. 2012)). The critical inquiry for the court is whether the new statute "operates in the same fundamental ways" as the old one. *Id.* (quoting *Hargett*, 700 F.3d at 823); *see also Ne. Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Here, if the statutory changes "do not remove the harm" to McKee, the case remains live and suitable for judicial determination. *Kenjoh Outdoor*, 23 F.4th at 692 (quoting *Hargett*, 700 F.3d at 824). Though the district court declined to address the effect of PC 1070, Thrifty Med reprises its argument from below that the change in legislation removed McKee's harm. But this argument is unavailing. McKee's claims center on Tennessee's any-willing-pharmacy provisions as amended by PC 569. And because the provisions of PC 1070 operate in the "same fundamental way" as the law prior to PC 1070, McKee's potential harm remains.

Comparing PC 569 and PC 1070, we do not see any material change that would negate McKee's harm. Indeed, PC 1070's provision remains almost identical to PC 569's. For instance, both provisions state that PBMs or covered entities shall not interfere with a patient's right "to choose a contracted pharmacy or contracted provider of choice in a manner that violates § 56-7-2359." Tenn. Code Ann. § 56-7-3120(b) (2021); Tenn. Code Ann. § 56-7-3120(b) (2022). True, all of the language is not exactly same. PC 569's anti-steering provision states more generally that

PBMs and covered entities shall not interfere with a patient's rights "by other means, including inducement, steering or offering financial or other incentives," while PC 1070's version of the provision clarifies at § 3120(b)(2) what "other means" are proscribed: specifically, "[o]ffer[ing] financial or other incentives" to influence plan holders to use theirs or financially beneficial pharmacy services. (*Id.*). But these relatively minor adjustments do not move the needle as it relates to harm. Comparing the two provisions, the any-willing-pharmacy law has not "been sufficiently altered so as to present a substantially different controversy from the one the District Court" originally faced. *Hargett*, 700 F.3d at 823 (quoting *Ne. Fla. Ch. of Associated Gen. Contractors*, 508 U.S. at 662 n.3). Further, notwithstanding the State of Tennessee's agreement with Thrifty Med during district-court proceedings that the overall changes to PC 569 were substantial—noting, in particular, that PC 1070 incorporates a system of "preferred network" tiers and removes "limiting language" from the old law—these changes do not "fundamentally" alter the any-willing-pharmacy provisions centering this case. (R. 70, PageID 819–20, 849–50).

Thrifty Med resists this conclusion, positing that the new provisions only apply to PBMs. But these changes do not appear to apply only to PBMs. The McKee Health Plan is a self-insured/self-funded plan governed by ERISA. Both PC 569 and PC 1070 define "covered entities" as encompassing "self-insured" plans, and PC 1070 expands its definition specifically to include ERISA plans. Tenn. Code Ann. § 56-7-3102(1) (2022). Likewise, both statutes' § 3120(b) provisions expressly refer to PBMs *and* covered entities. Nothing suggests that PC 1070's amendment applies to PBMs alone. Thus, both the lack of material changes between the provisions

and PC 1070's applicability beyond PBMs suggest that the passage of PC 1070 did not remove McKee's harm and thus did not moot the case.[2]

## IV.

*Voluntary cessation*. McKee maintains that the district court incorrectly concluded that its claims are moot because there is no reasonable expectation that Thrifty Med will pursue reinstatement to the PDP network. In contrast, Thrifty Med argues that TCDI's dismissal of its administrative complaints, combined with its stipulations that it has no current plans to seek reinstatement, render McKee's claims moot. In other words, it contends that its voluntary cessation of reinstatement activities closes the door to the courts. But Thrifty Med's argument falls short. Read liberally, its stipulations suggest a suspension of conduct, not the termination of conduct. We have held that a defendant's "voluntary cessation" of challenged behavior moots a case only when there is "no reasonable expectation that the alleged violation will recur." *Resurrection Sch.*, 35 F.4th at 528 (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)). Given this requirement, the burden to demonstrate mootness through voluntary cessation is substantial. And this "heavy burden" of persuading the court that challenged conduct has ceased "lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Thrifty Med does not meet the "heavy burden" of persuading this court that it is unlikely to resume its pursuit of reinstatement in the McKee PDP network under Tennessee's any-willing-pharmacy law.

---

[2] In light of this conclusion, we do not find it dispositive that McKee did not amend its Complaint after PC 1070 became effective, given that PC1070 largely superseded PC 569's any-willing-pharmacy provisions. Amending the complaint was not essential because the any-willing-pharmacy law was not fundamentally altered. Though McKee's amendment of the complaint would have streamlined the analysis, under *Kenjoh Outdoor*, the court retains jurisdiction to decide the matter if PC 1070 operates in the "same fundamental ways" as PC 569. 23 F.4th at 692 (quoting *Hargett*, 700 F.3d at 823).

While most of our voluntary-cessation jurisprudence centers on "claims of discontinuance by public officials," the "process of predict[ing]" the likelihood of future conduct applies to private defendants as well. *See* 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3533.5 (3d ed. 2023). Indeed, a private defendant's claims of voluntary cessation arguably should be accepted *less readily* than actions involving public officials because they rarely involve "broad public interests." *Id.*; *see also Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022) ("Government defendants have an easier time satisfying this test because we presume that they will not resume their challenged conduct unless objective evidence suggests that they have made a bad-faith change to avoid judicial review."). Sitting en banc, we considered in determining when a party's voluntary cessation had mooted a case whether: (1) the cessation is remote in time from the filing of the lawsuit; (2) the government entity provided alternative justifications for its changed conduct; (3) the state official or officials responsible for the policy are politically accountable; (4) "relevant circumstances have changed dramatically," and (5) reimposition of a similar policy in the future "likely would not present substantially the same legal controversy." *Resurrection Sch.*, 35 F.4th at 529. While *Resurrection School* analyzed the actions of a governmental actor, some of the principles on which the decision stands can also be relevant to private actors: the timing and alternative justification of cessation, the status of the "relevant circumstances," and whether future action would present a substantially similar legal controversy. *Id.* at 528. Each is an equally useful gauge for assessing whether Thrifty Med has proven with absolute clarity that there is "no reasonable expectation" that the plaintiff's original injury will recur. *Id.*

A.

*Timing and Alternative Justifications*.  The timing of cessation may suggest the injury will not recur the further away the cessation occurs from the start of litigation and when it is for reasons unrelated to litigation.  *See Resurrection Sch.*, 35 F.4th at 529 (determining that the cessation was genuine when eight months elapsed between the filing of the lawsuit and the agency's rescission of its mandate for reasons unrelated to litigation); *Schlissel*, 939 F.3d at 769 (holding the timing of a university's change in policy raised suspicion that its cessation was not genuine when it removed the policy's challenged definitions after the complaint was filed); *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016) (finding a secretary's issuance of a new form did not "inspire confidence in his assurances regarding the likelihood of recurrence," when he "issued that new form on the same day as the parties' final merits briefs were due before the district court . . . and only then present[ed] his mootness argument") *rev'd on other grounds*, 138 S. Ct. 1833 (2018); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007) ("In this case, that burden is increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed.").  Thrifty Med's timing in ceasing its efforts to obtain reinstatement raises suspicion that it may not be genuine.

Here, unlike the government's argument for why pandemic-related restrictions at issue in *Resurrection School* would not be reinstated—which was informed by *unrelated* pandemic considerations eight months after the suit was filed—Thrifty Med's cessation came immediately after changes in legislation that would seemingly benefit its cause.  Thrifty Med says that because it did not pursue any additional claims after the TDCI dismissed its administrative complaints, the relevant period for considering the timing of cessation should be the year since the administrative

dismissal. But Thrifty Med did not prompt the dismissal of the administrative complaints; TDCI acted on its own authority—in its own timing, and Thrifty Med maintained its entitlement to reinstatement even after the dismissals. We therefore question how these unprompted dismissals can be read to reveal the intentions or likely future conduct of Thrifty Med.

Moreover, linking the cessation timing to the administrative dismissals ignores Thrifty Med's actions undertaken during the present litigation, including its assertion in its Answer and Affirmative Defenses that it enjoys a "statutory right" to inclusion in the Health Plan. (R. 12, PageID 68). And even though it now says no dispute continued to exist after the dismissal of the administrative complaints, it proceeded to answer the complaint rather than seek dismissal. In terms of sequence, Thrifty Med filed its answer after all the administrative complaints were closed and despite an explanation from the TDCI that it did not have jurisdiction under PC 569 for plans governed by ERISA. Given this context, the more plausible explanation for these actions is that Thrifty Med did not view the closing of the administrative complaints as the end of the dispute and instead chose to pursue reinstatement through its response to litigation.

Indeed, Thrifty Med continued to pursue reinstatement throughout the pendency of the litigation and did not stop until legislation it deemed to be favorable passed. As noted, the legislature voted to pass PC 1070 on April 27, 2022. The Governor approved it on May 25, 2022, and it became effective January 1, 2023. Thrifty Med filed its motion to dismiss on May 24, 2022—albeit in compliance with a previously-established litigation deadline. Still, on the eve of the new law's adoption, Thrifty Med offered its stipulation that it had no "current" plans to pursue reinstatement to the PDP under PC 569 and, importantly, reserved its rights under PC 1070. Even then, it was only at the prodding of the district court during the hearing on its motion that Thrifty Med offered an equivocal stipulation about its "current" plans under PC 1070. Because Thrifty

Med was likely aware that the PC 1070 amendments would make it easier to support its reinstatement claims, its cessation—its stipulations reserving its rights under PC 1070—cannot be understood as unrelated to McKee's lawsuit. *Resurrection Sch.*, 35 F.4th at 529. Thus, Thrifty Med's cessation after legislation explicitly applicable to ERISA plans renders the timing suspect. *See Schlissel*, 939 F.3d at 769.

*Change in Circumstance.* Nothing else points toward mootness. As discussed, the change in law did not present a dramatic "change in the circumstances of the two parties" because Tennessee's any-willing-pharmacy statutes were not fundamentally altered. And the lack of any judicial or administrative complaints is also not dispositive. Even without its administrative complaints, Thrifty Med filed an answer accusing McKee of statutory violations *after* the three complaints had already been closed. Moreover, despite Thrifty Med's current claims that it has no desire to do business with McKee, that suggestion falls far short of providing absolute clarity that McKee's challenged practice will not recur, especially given Thrifty Med's other equivocations in the record. *See Laidlaw*, 528 U.S. at 189.

*Same Legal Controversy.* Lastly, any new action based on PC 1070 would present substantially the "same legal controversy" as the dispute in the present case. Instead of assuring the court that it would no longer pursue reinstatement entirely, Thrifty Med stipulated its cessation only under the *current* version of Tennessee's any-willing-pharmacy scheme (PC 569). As previously noted, not only is the language between the two statutes almost identical, PC 1070 is *explicitly* applicable to ERISA plans. Accordingly, Thrifty Med's reservation of its rights to pursue reinstatement under an identical and more favorable PC 1070 suggests no commitment to cessation at all.

B.

*Involuntariness of the Administrative Complaints.* One further point is worthy of discussion. Since the district court focused primarily on the closing of the administrative complaints, both parties spent a considerable amount of time discussing the importance of the closures and the applicability of this court's holding in *TCI/TKR Cable v. Johnson*, 30 F. App'x 581 (6th Cir. 2002). Though *TCI/TKR* is not a binding decision, it did address mootness in the context of an action involving two private, non-governmental parties. Yet, even considering *TCI/TKR*, the dispute is not moot.

Relying on *TCI/TKR*, Thrifty Med asserts that the voluntary cessation doctrine does not apply because the administrative complaints were dismissed involuntarily. In *TCI/TKR*, this court weighed whether the dismissal of a state court's class action rendered a cable company's (TCI/TKR's) declaratory judgment action seeking to prevent a subscriber from litigating that same state class action was moot. *See id.* The panel held that regardless of whether the dismissal was with or without prejudice and regardless of whether a particular non-class member, Mr. Johnson, *could* intervene in another class action involving the same issue, the declaratory action was moot because TCI/TKR did not face an "immediate prospect" of defending Mr. Johnson's state-law claims. *Id.* at 584. Thus, "an actual controversy" no longer existed. *Id.* at 585. Regarding the voluntary cessation doctrine, the court reasoned that because Mr. Johnson did not voluntarily dismiss his state class action lawsuit (dismissed by the state court), it could not be inferred that Johnson "was seeking to thwart the enforcement of the law by abandoning his state class action suit with the intent of refiling the suit after the dismissal of TCI/TKR's declaratory judgment action." *Id.* at 584.

Here, unlike the involuntary state court dismissal in *TCI/TKR*, Thrifty Med's cessation was intentional. While it is true that the TDCI did dismiss Thrifty Med's administrative complaints independently from Thrifty Med, as discussed above, their closure did not fully extinguish McKee's harm. We know this because Thrifty Med continued to assert McKee's purported statutory violations even after the administrative complaints were closed. Thrifty Med's cessation began with its stipulation to cease reinstatement efforts under PC 569 and its reservation to pursue reinstatement under PC 1070—a law that Thrifty Med ostensibly believed could support its prospects for reinstatement. Thus, unlike the harm facing the cable company in *TCI/TKR*, McKee continues to face the "immediate prospect" of defending itself against Thrifty Med's pursuit of reinstatement. *Id.*

McKee aptly commends us to the First Circuit's decision in *Adams v. Bowater* to suggest that Thrifty Med's "reservation" of its rights under PC 1070 in its stipulations warrants remand. 313 F.3d 611 (1st Cir. 2002). In *Adams*, our sister circuit rejected a claim of mootness that was premised on the defendant's recission of a proposed challenge to an ERISA plan amendment, concluding that the defendant's challenged behavior would likely recur. Basing their decision on the Supreme Court's test for the likelihood of recurrence, the court found that despite the defendant's recission of its challenged ERISA plan amendment, the action was not moot because the defendant had been "persistently unwilling either to admit that its amendment was unlawful" or to "say that it [would] not be reintroduced." *Id.* at 614. Acknowledging that developing case law suggested that the law could soon become consistent with the defendant's "interest to try to reinstate the amendment," the court reasoned that where a defendant is "unwilling to give any assurance that the conduct will not be repeated, a natural suspicion is provoked that recurrence may well be a realistic possibility." *Id.* at 615.

As in *Adams*, when the law was changing in Thrifty Med's favor, it continued to be "unwilling" to admit the lawfulness of its exclusion from the plan. Like *Adams*, Thrifty Med's original reservation under PC 569 that it "remains to be determined" whether Thrifty Med would seek reinstatement under PC 1070 belies its assurances that its conduct has ceased. (R. 38-2, PageID 349). Similarly, Thrifty Med's counsel's representations before the district court that it has no "*current* intent or . . . plan" to seek reinstatement under PC 1070 do not fully reassure us of Thrifty Med's future conduct. (R. 70, PageID 856). Rather, Thrifty Med's limited assurances provoke a "natural suspicion" that its pursuit for reinstatement is a "realistic possibility." *Adams*, 313 F.3d at 615.

Ultimately, Thrifty Med has not demonstrated with absolute clarity that McKee will not have to defend against a renewed pursuit of reinstatement from Thrifty Med.

## V.

For the reasons discussed, we **REVERSE** the decision of the district court, **VACATE** the opinion and order, and **REMAND** this case for further proceedings.